IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LUCILE YOUNGBLOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CASE NO.: 1:13-cv-00033-MHT-TFM |
| v. | ) | |
| | ) | |
| GEORGE C. WALLACE STATE | ) | |
| COMMUNITY COLLEGE, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, George C. Wallace Community College ("the College") (incorrectly named George C. Wallace State Community College), the Alabama Department of Postsecondary Education ("DPE"), Linda C. Young ("Young"), Mark A. Heinrich ("Heinrich"), the Board of Education of the State of Alabama ("the Board"), Board President Governor Robert Bentley, Board Vice President Charles Elliott, Board members Betty Peters, Stephanie Bell, Yvette Richardson, Ella B. Bell, Jeffery Newman, Tracy Roberts, and Mary Scott Hunter, and past Board members Randy McKinney and Gary Warren ("Defendants"),[1] submit this brief in support of their Motion for Summary Judgment as to all claims stated by Plaintiff Lucile Youngblood ("Youngblood" or "Plaintiff") against them.

## INTRODUCTION

Youngblood alleges the following in her Second Amended Complaint:

- Title VII disparate treatment discrimination based on race and gender against the College only (Counts One and Two);

---

[1] Defendant Freida Hill has never been served with a copy of the Complaint, and she has not been made a defendant in this action.

1

- Hostile work environment based on race and gender against the College only (Counts One and Two);

- Title VII retaliation against the College only (Count Three);

- First Amendment retaliation pursuant to § 1983 against all Defendants (Count Four);

- Fourteenth Amendment Equal Protection violation pursuant to § 1983 against all Defendants (Count Five);

- Race and gender discrimination pursuant to § 1981 against all Defendants (Count Six);

- Violation of the Equal Pay Act ("EPA") against the College only (Count Seven).

On October 17, 2013, Defendants moved to dismiss many of these claims on multiple grounds.[2]  Youngblood thereafter conceded that any § 1983 claims against the College, DPE, and/or the Board, any § 1983 official capacity claim for damages, and any § 1981 claim for gender discrimination is due to be dismissed.  (*See* Doc. 60, at pp. 3-4, 14.)

In addition to the claims for which Youngblood concedes dismissal, summary judgment is due to be granted for the following reasons set forth in Defendants' motion to dismiss filings:

- Youngblood's Title VII retaliation claim and any Title VII discrimination claim based on anything other than disparate pay are outside the scope of her EEOC charges.  *See Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 588 (11th Cir. 2007).

- Youngblood's § 1981 race discrimination claim is redundant of her § 1983 claim.  *See Alexander v. Chattahoochee Valley Cmty. Coll.*, 325 F. Supp. 2d 1274, 1276 n.1 (M.D. Ala. 2004) (Thompson, J.).  The College, DPE, and the Board are also absolutely immune from any § 1981 claim.  *See Penn v. Ala. Dep't of Corr.*, 2011 WL 4361636, at *4 (M.D. Ala. Sept. 19, 2011) (Thompson, J.).  Youngblood's § 1981 claim is due to be dismissed against all Defendants except the College, which is immune, for the additional reason that there is still no allegation, much less evidence necessary to overcome summary judgment, that Youngblood had a contractual relationship with any Defendant but the College.  *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476-80 (2006).

- Defendants Randy McKinney and Gary Warren are due to be dismissed on the ground of insufficient service of process.  *See* Fed. R. Civ. P. 4.

---

[2] Defendants incorporate by reference their arguments from their motion to dismiss filings.  (*See* Docs. 58, 61.)

- While Youngblood makes generalized allegations of a "pattern and practice" of discrimination (*see, e.g.*, Sec. Am. Compl., Doc. 57, at ¶¶ 10, 60-61), any "pattern and practice" claim is impermissible. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 967-69 (11th Cir. 2008).

As set forth more fully below, summary judgment is also due to be granted for the

following reasons:

- Defendants are immune from Youngblood's § 1983 claims. *See, e.g., Harden v. Adams*, 760 F.2d 1158, 1164 (11th Cir. 1985).

- Youngblood cannot state a *prima facie* case of First Amendment retaliation because there is no evidence that she spoke on a matter of public concern or that she suffered an adverse employment action as a result. *See Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007).

- Youngblood cannot state a *prima facie* case of Title VII retaliation, including engagement in protected activity, adverse employment action, and "but-for" causation. *See Univ. of Tex S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

- Her allegations do not rise to the level of a cognizable hostile work environment claim. *See McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008).

- Youngblood has failed to identify proper comparators for her Title VII race and gender discrimination claims. Regardless, the College had a legitimate, non-discriminatory reason for its pay decisions, which Youngblood cannot show was pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000); *Drake-Sims v. Burlington Coat Factory Warehouse of Ala., Inc.*, 330 F. App'x 795, 803 (11th Cir. 2009).

- With respect to Youngblood's EPA claim, there is no genuine issue of material fact that the College's pay decisions were based on a factor other than sex. *See Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995).

- Youngblood's claims are also barred (or, at the very least, extremely limited) by the applicable statutes of limitations. *See, e.g., Puckett v. Pettway*, 2007 WL 2784415, at *2 (M.D. Ala. Sept. 24, 2007) (Thompson, J.); 42 U.S.C. § 2000e-5; *Burch v. P.J. Cheese, Inc.*, 935 F. Supp. 2d 1259, 1279-80 (N.D. Ala. 2013).

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

**Background**

Lucile Youngblood, a black female, worked at Alabama Aviation and Technical College ("Alabama Aviation"), which is not a defendant in this action, as a co-op student in 1986 and then was hired in 1987 in Alabama Aviation's print shop.[3]  (*See* Ex. A, Pltf dep., 26:14-30:15, Ex. 1.)  In 1997, Alabama Aviation merged with Wallace Community College.  (*See* Ex. B, Young dep., 22:23-24:3; Ex. C, Young's Responses to Pltf's First Set of Interrogatories, at No. 17.)  Youngblood worked as a print shop operator for Alabama Aviation until approximately January 1998 when she was assigned to the print shop at the Wallace Community College campus as a Printing/Duplications Technician.[4]  (*See* Pltf dep., 22:1-19, 58:13-23, 76:18-79:5, Exs. 1-7.)  When Alabama Aviation and the College de-merged in 2003, Youngblood remained employed at the College until her retirement in November 2011.  (*See* Pltf dep., 100:3-17, Ex. 29; Young dep., 21:16-22:22, 24:13-17; Young's Responses to Pltf's First Set of Interrogatories, at No. 17.)

Defendant Young became the College President in 1999 and still holds that position.  (*See* Young dep., 19:21-21:9, 23:15-19.)  Defendant Heinrich is the current Chancellor of Alabama's two-year college system, although he did not become Chancellor until after Youngblood retired.  (*See* Pltf dep., 256:3-4; Sec. Am. Compl., Doc. 57, at ¶¶ 17, 24, 54.)  Youngblood has also sued the individual members of the Alabama Board of Education, although

---

[3] In a previous pleading, Youngblood attached an August 29, 1988 memo by then-Alabama Aviation interim president John Johnson (*see* Pltf dep., 52:4-8) who wrote that she was "one of only three minority employees of the college" and was "currently paid on Schedule H-23-Step 1[,]" which "appears to have been done to limit her potential for future employment status and for benefits."  (Pltf dep., Ex. 4.)  This approximately 25-year-old memo is irrelevant to this action since Alabama Aviation is not a defendant and Youngblood's claims all relate to her employment at Wallace Community College.  (*See, e.g.*, Pltf dep., 52:12-15, 247:18-248:5 (Youngblood admits that the memo references her employment at Alabama Aviation)); Fed. R. Evid. 401, 402 (irrelevant evidence is inadmissible).

[4] Youngblood's original job title was "Duplications Clerk," although her position was always the same.

she concedes there is no evidence that the Board members have or had <u>any</u> knowledge of the terms and conditions of her employment or that they were involved in any decisions concerning her employment.  (*See* Pltf dep., 257:9-258:19, 260:6-12.)

**Youngblood's job classification and multiple evaluations of that classification**

The College has various salary schedules for the job classifications of its employees:

> Salary Schedule A covers presidents.  B covers deans.  C covers professional staff.  D-1 and D-2 cover instructors.  D-3 covers adult education.  E covers support staff.  And then there are . . . a few other schedules that cover people who work varying hours, like schedule H . . . .

(*See* Young dep., 61:20-62:5, 104:13-106:12, Ex. 11.)  There are different levels and grades within each salary schedule.  (*See id.*, 62:6-12.)  On the E salary schedule, the only salary schedule at issue in this action, there are five levels, E-5 to E-1, with E-5 being the lowest level of compensation on that salary schedule.  (*See* Young dep., 66:23-67:10; Ex. D, Wilkins dep., 180:2-20, Ex. 38.)  Within E-5, there are also grade levels six and seven, with six paying more than seven.  (*See* Young dep., 67:10-15, 69:2-11; Wilkins dep., 180:21-181:7, Ex. 38.)  Placement on a particular salary schedule, level, and grade "depends on the job description and the compensable factors within the job description and the levels of responsibilities for that particular job."  (*See* Young dep., 62:13-22, 92:2-94:8, Ex. 5; Wilkins dep., 201:14-204:15, Ex. 18 (discussing compensable factors).)  An employee is also placed on a certain step from 0-27 depending on their past public education experience or other relevant experience.  (*See* Young dep. 62:23-64:2; Wilkins dep., 91:20-92:10, 181:14-182:2.)

Upon her assignment to the College print shop in 1998, Youngblood's salary remained at E5, 07 like it was at Alabama Aviation, meaning that her job was classified on salary schedule E, level 5, grade 7.  (*See* Pltf dep., 86:7-19.)  On February 20, 1998, Youngblood requested a review of the job classification of the Printing/Duplications Technician position at the E5, 07

salary schedule. (*See id.*, Exs. 9-10.) Accordingly, Dr. Keith Ward ("Ward"), an outside job classification consultant who had provided consulting services for numerous educational institutions and was also reviewing other job classifications at the College at that time, reviewed Youngblood's job classification at the College's request. (*See* Pltf dep., 83:6-83:18, 86:19-92:21, Exs. 10-11; Ex. E, Ward dep., 17:22-18:19, 90:6-9.)

Ward's analysis of any particular job was always to "focus on the duties, rather than any person who might be in that job at the present time . . . . And so, nothing was ever done on a personal basis." (*See* Ward dep., 38:12-39:4.) Ward assessed duties, not a person, and positions, not people. (*See id.*, 59:10-17, 74:22-75:2.) He dealt "with compensable factors, knowledge, skills and abilities of the person's job description as they wrote them down . . . ." (*See id.*, 76:10-17, Ex. 1.) As part of his review, Ward (1) reviewed a job analysis worksheet completed by Youngblood and acknowledged by her to be an accurate representation of her current job duties and qualification, and (2) discussed her job duties with her. (*See* Pltf dep., Ex. 11; Ward dep., 58:14-23.) After doing so, he determined that the print shop position was properly classified at the E5, 07 level and that no change was warranted. (*See* Pltf dep., 83:6-83:18, 86:19-92:21, Exs. 10-11; Ward dep., 17:22-18:19, 90:6-9.)

Youngblood requested another review of the Printing/Duplications Technician position on February 8, 1999. (*See* Pltf dep., 93:20-95:17, Ex. 12.) Ward again reviewed the job classification for that position, including another job analysis worksheet acknowledged by Youngblood to be an accurate representation of her current job duties and qualifications, and determined again that the position was properly placed on the E5, 07 level. (*See id.*, 123:9-13, Ex. 13.) He reviewed Youngblood's job classification for a third time in November 1999 with the same result. (*See id.*, 130:12-131:6, Exs. 14, 16.)

Ward testified about the classification of Youngblood's position as follows:

A:   She had a job that was on the lower end of the required preparation to do a job. She thought it would take years to learn her job, and I thought it would take a matter of a couple of months.

And so, you know, we just agreed to disagree. And I put her in where I thought was appropriate based upon the written job description. We did her job analysis questionnaire completely twice. . . .

And so, gave her a chance to completely redo it so that she would get the benefit of everything she needed to do or needed to change. And – and so, she had every opportunity to – to improve her . . . classification, but she just doesn't – didn't have the – the job to allow her to improve it.

. . .

Q:   Did you – through your receiving the job analysis questionnaire and your several meetings with Mrs. Youngblood, did you have a good sense that you had – Did you have a good feeling that you had a good sense as to what her job duties actually entailed?

A:   I did.

Q:   You felt comfortable that you know what her job was?

A:   Very comfortable.

(Ward dep., 44:14-45:14, 91:1-11; *see also id.*, 45:15-46:22, 91:12-94:8, Ex. 1 (describing job analysis process).) Ward thoroughly evaluated and reevaluated Youngblood's job classification multiple times, including personal interviews with her "a number of times" to discuss her job duties and what she was doing in the print shop, always with the same result.[5] (*See* Pltf dep., 162:4-8, Exs. 16-17; Ward dep., 43:18-20, 58:14-23, 89:16-90:5, 95:1-10.)

The College accepted Ward's reviews each time and Youngblood remained on the same salary schedule. (*See* Pltf dep., Exs. 16-17.) Youngblood acknowledged receiving Ward's analysis of her job classification on January 26, 2000, but stated that the issue was "not resolved"

---

[5] Youngblood's expert witness agrees "that the study led by Dr. Ward included a rigorous job analysis, especially with respect to Ms. Youngblood's job[,]"and that it was "a good job analysis" and "done very well." (*See* Ex. F, Buford dep., 101:22-102:5, 178:23-179:14.)

and she found "it to be unacceptable." (*See id.*, Ex. 18 at 850.)  However, she never filed an

EEOC charge, lawsuit, or grievance with respect to Ward's review of her job classification or the

College's decision to maintain it at the E5, 07 level.[6]  (*See id.*, 93:16-19, 147:2-14, 199:9-15.)

**Wade Glover's transfer to the College print shop**

The College hired Wade Glover ("Glover"), a white male, as a building/grounds

employee on a temporary basis in August 1991; he was subsequently promoted to the permanent

position of Lead Grounds Maintenance Worker effective October 1, 1991 and to Supervisor of

Grounds Maintenance, supervising four full-time employees, on June 11, 1996.  (*See* Ex. G,

Defendants 000016, 19, 628, 658; Ex. H, Glover dep., 14:9-14, 17:2-22.)  In September 2000,

the College requested Glover's reassignment to the print shop effective October 1, 2000.  (*See*

Young dep., 134:17-135:1, Ex. 24.)  Dean Lynn Bell, who has been the Dean of Business Affairs

at the College for over seventeen years (Wilkins dep., Ex. 29, at ¶ 1),

> had been noticing that Mr. Glover was having some . . . issues dealing with the
> outside work in terms of the heat.  He found it in his observation – found that,
> through his observation, Mr. Glover just was not handling the physical
> requirements of the position as well as he had been in the past.  There was a need
> in the Print Shop at that time.  Mr. Glover has 35 years of printing experience so
> Dean Bell approached Mr. Glover and asked him if he would be willing to
> transfer from Grounds and Maintenance Supervisor to the Print Shop, and Mr.
> Glover said that he would be willing to make the transfer.

(Wilkins dep., 71:1-72:3; Young's Responses to Pltf's First Set of Interrogatories, at No. 8

("When Mr. Glover's health became a concern, the decision was made to transfer him to the

print shop . . . ."); *see also* Young dep., 136:16-138:9; Glover dep., 11:7-14:9 (discussing

Glover's prior experience in the printing industry).)  Glover testified that Dean Mark Shope (now

retired) and Bell decided that he would be transferred to the print shop as a Printing/Duplications

Technician "[b]ecause I was familiar with the Print Shop and [offset] printing [*i.e.*, manual

---

[6] While Youngblood wrote a memo about perceived discrimination in 2000, she never gave it to anyone at the College or the EEOC.  (*See* Pltf dep., 151:13-152:11, Ex. 18 at 00067-69.)

printing on a printing press], and they had no one to print in that department." (*See* Glover dep., 21:19-22:5; *see also id.*, 18:14-18.)

Glover and Youngblood were both always Printing/Duplications Technicians in the College print shop. (*See* Pltf dep., 176:6-177:6; Wilkins dep., 61:10-22, Ex. 29 at ¶ 16 and Exs. D & E thereto; Glover dep., Ex. 7; Buford dep., 141:3-142:10.)   Glover performed primarily offset printing duties; Youngblood performed primarily copying/document reproduction duties and did not create or design documents. (*See* Pltf dep., 193:9-15, 214:5-216:8; Glover dep., 22:21-25:15; Wilkins dep., 166:14-21, Ex. 29, at ¶¶ 6, 11, 16.)   The Printing/Duplications Technician position has no supervisory responsibilities. (*See, e.g.*, Wilkins dep., Ex. 29 at Exs. D & E thereto.)

Upon his permanent reassignment to the print shop, Glover retained his E4 salary from his position as Supervisor of Grounds Maintenance because the College "does not lower pay to transfer a person." (*See* Wilkins dep., 73:5-21, 77:5-14, Ex. 29 at ¶ 3 ("The College maintained Mr. Glover's salary at the E4 wage rate pursuant to the College's practice not to lower an employee's pay if he or she is transferred to a position in a lower classification.").)   Thus, although Glover was paid more than Youngblood, his pay was tied to "the position he was already in when he was reassigned to the Print Shop." (*See* Young dep., 153:11-23.)   Young explained: "[I]t has been the college's policy for everyone that we don't reduce salaries.  When they are reassigned or as a result of merger in any way or anyone that is reassigned on a job, . . . we have never reduced any salaries." (*See* Young dep., 163:1-9; *see also* Wilkins dep., Ex. 21 (memos to both Youngblood and Glover regarding placement on the E salary schedule and stating that the College "will not lower any current employee's salary").)

**Youngblood's retirement and the hiring of Kimberly Johnson into the newly-created position of Duplications Technician**

On September 14, 2011, Youngblood informed Young that she would be retiring on November 1, 2011, and she subsequently retired on that date. (*See* Pltf dep., 221:17-22, Exs. 29-32, 34; *see also id.*, 12:19-21, 15:19-21.)  Her notification to Young and Shope stated: "Today September 14, 2011 I Lucille Youngblood submit November 1, 2011 to be my retirement date from Wallace Community College Dothan, Alabama.  Thanks for everything!"  (*See id.*, Ex. 29.) She received her last paycheck on October 31, 2011. (*See* Ex. I, Wilkins Aff., ¶ 3.)

The College thereafter created a new position of Duplications Technician, which was a separate and distinct position from Youngblood's and Glover's job as Printing/Duplications Technician. (*See* Wilkins dep., 54:14-58:12, Exs. 3, 31; *see also id.*, Ex. 29 at ¶ 9.)  Specifically:

> After Ms. Youngblood retired, Dean Shope and [Dean Bell] discussed the needs of our campus print shop.  We discussed that the College was phasing out manual printing and moving from a traditional print shop to an electronic/digital print shop.  We anticipated that Mr. Glover (who is currently 80 years old) will retire soon and discussed that the College will not hire someone into Mr. Glover's position or otherwise replace him when he retires.  We also anticipated that once Mr. Glover left and/or the manual printing equipment no longer worked, approximately 90% or more of the College's printing work would be done on electronic equipment.

> As a result, we determined it was necessary to hire someone into the print shop who was competent and skilled in the current and emerging electronic equipment and graphic design software.  We also wanted someone who was familiar with the changing technology in this area, including someone who could assist the College and College personnel in graphic design, as needed, for things such as presentations, flyers, etc. . . .  [W]e anticipated that this person would eventually take over all functions of the print shop, *i.e.*, be in charge of the entire print shop.  We also anticipated that when the College began contracting out any manual printing work, the new position would be in charge of negotiating and maintaining such third-party contracts.

> We anticipated that whoever was hired as the Duplications Technician would, among other things, assist with the creative design process, manage digital interface operations, and manipulate equipment across networks and remote sites . . . .

10

(*See* Wilkins dep., Ex. 29, at ¶¶ 7-8, 10; *see also id.* at ¶¶ 9, 11, 17-18; Young dep., 166:8-168:15.)

The College placed the new position on salary schedule E4, 05 prior to even advertising the position and without reference to who was hired into the position. (*See* Wilkins dep., Ex. 29, at ¶¶ 12-15 and Exs. A & B thereto.) "The decision to classify the Duplications Technician position at Salary Schedule E4, 05, which is a higher classification than the E5, 07 classification of the Printing/Duplications Technician position, was a result of the additional job duties for the new position." (Wilkins dep., Ex. 29, at ¶ 13.) The position was not filled in 2011 because no qualified applicants applied. (*See* Wilkins dep., 79:5-80:10, 195:3-8, Ex. 29, at ¶ 14.) The College re-advertised the position in 2012 and hired Kimberly Johnson, a white female and the only qualified applicant, in December 2012. (*See* Wilkins dep., Ex. 29, at ¶ 15; Ex. J, Johnson dep., 36:6-10, Exs. 4-5; Ex. K, Defendants 002023; Wilkins Aff., ¶ 4.)

As acknowledged by the College's expert witness, the College did not do as good of a job as it could have in drafting the job description of Duplications Technician to actually reflect all requirements and duties of that position. (*See* Ex. L, Locklear dep., 112:8-113:10, 125:17-126:3.) Despite this, there is no dispute that the Duplications Technician position encompasses duties, including but not limited to assisting in the creative design process, that are not and were not duties of Youngblood or Glover in the Duplications/Technician position. (*Cf., e.g.,* Pltf dep., 214:5-216:8 *with* Wilkins dep., Ex. 29, at ¶¶ 8-11; *see also* Wilkins dep., 55:19-59:13, 199:2-201:2, Ex. 31 (discussing distinctions between the Printing/Duplications Technician position held by Youngblood and Duplications Technician position held by Kimberly Johnson).) Johnson also has procurement responsibilities, such as putting together bid specifications and negotiating contracts, that were not part of Youngblood's position. (*See* Wilkins dep., Ex. 29, at ¶ 11.) The

College is in the process of updating its "E" salary schedule job descriptions, including the Duplications Technician position, and anticipates that the new description will encompass all of the duties that the current Duplications Technician performs. (*See* Wilkins dep., Ex. 29, at ¶ 19.)

**Youngblood's alleged comparators**

Youngblood identifies her comparators as Benjamin Craig ("Craig"), a black male (*see* Ex. M, WallaceStateSelma 000001-2), Wade Glover, a white male, and Kimberly Johnson, a white female. (*See* Ex. N, Statement of Damages, at p.3.) She does not know who Craig is, where he works, what his job title is, what his job duties are, or what he is paid. (*See* Pltf dep., 252:10-253:6.) Craig is employed as the Print Shop Operator/Inventory Clerk at Wallace Community College Selma ("Wallace-Selma"), which is a separate entity from Defendant Wallace Community College, on salary schedule E4, 05. (*See* Ex. O, Josey Aff., ¶ 2; WallaceStateSelma 000015-16, 24, 59.) Craig became Wallace-Selma's Print Shop Operator/Inventory Clerk in 2004. (*See* WallaceStateSelma 000015-16, 24, 59, 65, 70.) He is responsible not only for Wallace-Selma's Print Shop, but also for maintaining the physical inventory of all school property at multiple locations throughout the state. (*See* WallaceStateSelma 0000024, 65, 70.) In addition to his print shop and inventory control duties, he is also responsible for surplus property sales, shipping and receiving, and serves as back-up to Wallace-Selma's bookstore manager. (*See id.*)

**Youngblood's EEOC charges and new allegations of hostile work environment**

On February 13, 2012, Youngblood filed an EEOC charge alleging race and gender discrimination because she had "found information about a white male colleague who performed similar work as I performed but he was paid more." (*See* Pltf dep., Ex. 35.) However, there is

no dispute that Youngblood had made the decision to retire before she ever knew that Glover (or any other alleged comparator) was paid more. (*See, e.g.*, Pltf dep., 242:17-20, Ex. 35.)

Youngblood stated in her EEOC charge that she believed that "females, regardless of their skills, qualification, or experience, are hired at lower rates and remain on lower pay rates than men with equal or less qualifications or skills." (*See* Pltf dep., Ex. 35)  She amended the charge in August 2012 to include her allegation that "African-Americans regardless of their skills, qualifications or experience are hired at lower rates and remain on lower pay rates than Caucasians with equal or less qualifications or skills." (*See id.*)  There are no allegations in either charge about anything other than unequal pay. (*See id.*)

No one at the College ever physically threatened or directed a racially derogatory or sexist term at Youngblood.  (*See* Pltf dep., 216:9-20, 259:17-20.)  She has made generalized allegations that she had "to perform menial tasks and perform a greater share to [*sic*] the printing, lifting and delivering of materials than her white male counter-part." (*See* Sec. Am. Compl., Doc. 57, at ¶¶ 73, 79.)  She admits, however, that she never complained to anyone about allegedly having to perform a greater share of the work.  (*See, e.g.*, Pltf dep., 171:7-23.)  For example, she claims that "[w]hen we moved the print shop from one location to another location, Mr. Glover touched not nothing[,]" but she did not complain to anyone about this.  (*See id.*, 169:19-170:11.)  According to her, Young "knew nothing about what was going on in the [print] shop[,]" and did not know "who was doing the work, me or Wade [Glover], she knew nothing." (*See* Pltf dep., 172:1-15.)  Youngblood testified that Young never came into the print shop. (*See id.*)

In addition to these allegations, Youngblood testified that on one occasion in September 2011, her supervisor prevented her from receiving a "Wallace-gram," which consisted of

balloons and a card, from another employee in appreciation for her work. (*See id.*, 135:21-139:10.) She also claims that when she received another Wallace-gram in 2011 her picture was not taken initially for an email or the College newspaper and that when it was taken for the newspaper, "it wasn't a really good picture. It was a good picture of me, but the background in the back was just sloppy looking, you know." (*See id.*, 139:11-141:23.) Youngblood does not know, however, whether every time somebody at the College got a Wallace-gram, their picture was put in the email or newspaper. (*See id.*, 145:9-14.) Even so, as discussed above, none of these allegations or anything similar to these allegations was included in Youngblood's EEOC charges, in which she alleged only discrimination based on unequal pay. (*See id.*, Ex. 35.) Further, according to Youngblood, none of these allegations affected her work performance. (*See, e.g.*, Sec. Am. Compl., Doc. 57, at ¶ 26 ("During the approximately 25 years that she was employed by the College, Plaintiff received excellent employment evaluations.").)

Youngblood read and acknowledged the College's personnel handbook on multiple occasions and knew that there was a complaint procedure under the handbook's harassment and discrimination policy. (*See* Pltf dep., 127:2-129:1; Ex. P, Plaintiff's 01529, Defendants 000948, 949, 950, 953, 954, 955.) However, while employed at the College, Youngblood never complained to anyone about any alleged harassment or discrimination of any kind on account of race, sex, or any other protected basis; in fact, she did not complain about alleged discrimination until she filed her February 2012 EEOC charge alleging disparate pay and, as discussed above, did not complain about alleged harassment until she filed her complaint in this lawsuit. (*See, e.g.*, Pltf dep., 198:9-16, 212:11-15.) She knew she could have complained, but simply chose not to do so. (*See, e.g., id.*, 169:19-170:11.)

## ARGUMENT

I.   **Defendants are immune from Youngblood's § 1983 claims (Counts Four, Five, and Six).**

Defendants incorporate by reference their immunity arguments in the motion to dismiss filings, including that the State is the real, substantial party in interest; accordingly, the individual Defendants are entitled to sovereign immunity. (*See* Doc. 58, at pp. 2-7; Doc. 61, at pp. 2-5); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 n.3 (11th Cir. 1998); *Alexander v. Chattahoochee Valley Cmty. Coll.*, 325 F. Supp. 2d 1274, 1295-96 (M.D. Ala. 2004) (Thompson, J.). In addition, the individual Defendants are due summary judgment because there is still no allegation against any of them that would except them from qualified immunity. Further, any claim for retrospective relief against the individual Defendants in their official capacities is barred.

### A.   Heinrich and the Board members enjoy qualified immunity from Youngblood's § 1983 claims.

To overcome qualified immunity, a plaintiff "has to come forward with specific facts, concerning each defendant, indicating that each defendant has violated" her constitutional rights. *See Smith v. Alabama*, 996 F. Supp. 1203, 1212 (M.D. Ala. 1998) (Thompson, J.). Youngblood admits that she has no evidence that Heinrich or any of the Board members played any role in any challenged employment decision. (*See* Pltf dep., 257:9-258:19, 260:6-12); *Harden v. Adams*, 760 F.2d 1158, 1164 (11th Cir. 1985) (affirming qualified immunity of university officials from plaintiff's § 1983 claims where there was no evidence that those individuals played any role in the challenged employment decisions); *see also, e.g.*, *Griggs v. Thomas*, 2012 WL 5989458, at *2-3 (M.D. Ala. Oct. 4, 2012). This admission is fatal to her § 1983 claims against Heinrich and the Board members. Defendant Heinrich is entitled to qualified immunity

for the additional reason that it was impossible for him to have committed any specific act violating Youngblood's constitutional rights since he was not Chancellor at the times at issue.

**B.      Defendant Young has qualified immunity from Youngblood's § 1983 claims.**

"Except under rare circumstances[,] government employees [are] immun[e] from suits against them in their individual capacities." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir. 1995). This "[q]ualified immunity protects government officials performing discretionary functions . . . from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996).

For qualified immunity to apply, the defendant must first prove that she was acting within the scope of her "discretionary authority" at the time of the allegedly illegal conduct. *See Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992). The burden then shifts to the plaintiff to prove that the defendant's actions violated clearly established law. *See id.* Even if the plaintiff meets this burden, the defendant is still entitled to qualified immunity where the record shows that she "was motivated, at least in part, by lawful considerations." *See Stanley v. City of Dalton*, 219 F.3d 1280, 1296 (11th Cir. 2000) (emphasis omitted); *see also id.* at 1295 ("[T]he presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity.").

There can be no dispute that Young was acting within the scope of her discretionary authority as President with respect to any employment decision at issue in this action. (*See* Sec. Am. Compl., Doc. 57, at ¶¶ 52-53); Ala. Code § 16-60-111.6 (college president has broad authority to manage college affairs and is responsible "for the day-to-day operation of" the college). Thus, it is Youngblood's burden to show that Young's actions violated clearly

16

established law, which she cannot do "by stating constitutional rights in general terms." *See Foy*, 94 F.3d at 1532.

Youngblood claims that Young violated her constitutional rights by not paying her the same salary as Glover.[7]   However, the College paid Glover more because of its policy to not reduce salaries as a result of a reassignment, which is a lawful reason. (*See infra*, §§ V. and VI.) Therefore, Young is entitled to qualified immunity because Youngblood cannot show that maintaining Glover's salary at his current level violated clearly established law. *See Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1269-73 (11th Cir. 2003); *see also Gonzalez v. Lee County Hous. Auth.*, 161 F.3d 1290, 1301 (11th Cir. 1998) ("[A] plaintiff who seeks to overcome . . . immunity must cite case law, in force at the time of the defendant's actions, that would have made it absolutely clear that the defendant's conduct violated federal law."); *Foy*, 94 F.3d at 1534 ("[T]he basic qualified immunity question [is whether] a reasonable officer [could] have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law[.]").

Finally, even if Young violated clearly established law, and even assuming she acted in part with discriminatory intent (which is denied), Young is still entitled to qualified immunity because the decision to retain Glover's E4 salary from his supervisor position when he was reassigned to the print shop was also motivated in part by lawful considerations, *i.e.*, a non-discriminatory salary retention policy. (*See supra*, p. 9); *Stanley*, 219 F.3d at 1295-98 (finding that district court erred in denying individual defendant qualified immunity where the evidence

---

[7] As discussed *infra*, Youngblood's other alleged comparators, Johnson and Craig, are not proper comparators. Even so, Young would still be entitled to qualified immunity with respect to any decision regarding Johnson, since Youngblood cannot show that paying a person more based on additional job responsibilities violates clearly established law.  Young could not have participated in any decision regarding Craig, since he is employed by an entirely separate college.

showed that his termination decision was based at least in part on a lawful motive, even if it was also based "in substantial part [on] an unlawful motive").

### C.   Youngblood is not entitled to any retrospective relief against Defendants in their official capacities.

Youngblood has already conceded that any § 1983 official capacity claim for damages is barred. (*See* Doc. 60, at pp. 3-4.)  Furthermore, Youngblood's official capacity claims should be entirely barred because the equitable relief she seeks implicates special sovereign interests that would interfere with the College's ability to make decisions regarding its staff. (*See* Doc. 58, at pp. 4-6; Doc. 61, at pp. 2-3); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999); *Alexander v. Chattahoochee Valley Cmty. Coll.*, 325 F. Supp. 2d at 1295-96 (Thompson, J.).

However, if the Court does not find that the individual Defendants are absolutely immune on this ground, Youngblood's official capacity claims against Defendants are barred on sovereign immunity grounds to the extent she seeks retrospective relief. *See Pears v. Mobile County*, 645 F. Supp. 2d 1062, 1078 n.22 (S.D. Ala. 2009); *see also Summit*, 180 F.3d at 1337. Specifically, Youngblood's request for declarations that Defendants violated her rights (*see* Sec. Am. Compl., Doc. 57, Compl., pp. 24-26) is prohibited. *See, e.g.*, *Cobb v. Marshall*, 481 F. Supp. 2d 1248, 1258 (M.D. Ala. 2007) (declaratory judgment seeking "a declaration from the court that Defendant's conduct 'violated' her rights[,]" is improper and must be dismissed); *see also Summit*, 180 F.3d at 1337.

The prospective relief Youngblood seeks does not relate to "a continuing violation of federal law by [D]efendants[, but to] discrete acts that occurred" years before and is also not allowed. *See Pears*, 645 F. Supp. 2d at 1078 n.22; *see also Summit*, 180 F.3d at 1336. The law does not allow official capacity suits "where prospective injunctive relief is sought solely to

remedy a one-time past deprivation" of the federal right at issue, as in this case where the "prospective" declaratory and injunctive relief requested by Youngblood is sought solely to remedy alleged past deprivations of her federal rights related to her pay.[8]  *See Pears*, 645 F. Supp. 2d at 1078 n.22.

II.     **Youngblood's § 1983 First Amendment retaliation claim (Count Four) fails because the undisputed facts show that Youngblood never spoke on a matter of public concern or suffered an adverse employment action.**

The Court need not reach the elements of Youngblood's § 1983 First Amendment retaliation claim since Defendants are immune from this claim as discussed in § I. above. Regardless, Youngblood "must show: (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action." *Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007).

The Court looks to the "content, form, and context" of an employee's speech and seeks the "main thrust" of that speech to determine whether it was speech on a matter of public concern. *See Myles v. Richmond County Bd. of Educ.*, 267 F. App'x 898, 900 (11th Cir. 2008). The inquiry is not whether the subject of the speech is something the public might have an interest in, but "whether [the employee] spoke on behalf of the public as a citizen, or on behalf of himself as an employee." *Berry v. Coleman*, 172 F. App'x 929, 932 (11th Cir. 2006). "[T]he employee's attempt at public disclosure is a relevant factor in making the determination." *Myles*, 267 F. App'x at 900; *see also, e.g., Eggleston v. Bieluch*, 203 F. App'x 257, 266 (11th Cir. 2006). An employee's complaints about her employer's treatment of her are not a matter of

---

[8] Any claim by Youngblood that Defendants are continuing to violate her rights is insufficient to overcome summary judgment. There must be "evidence of a continuing violation of federal law by [D]efendants[,]" and there is none. *See, e.g., Pears*, 645 F. Supp. 2d at 1078 n.22 (dismissing § 1983 official capacity claims when "the record wa[s] devoid of evidence of a continuing violation of federal law by defendants; rather, his requests for . . . relief . . . hinged exclusively on discrete acts that occurred in 2006 and early 2007").

public concern. *See Morgan v. Ford*, 6 F.3d 750, 754-55 (11th Cir. 1993). Furthermore, "an allegation of a Title VII violation cannot provide the sole basis" for a First Amendment retaliation claim. *See Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998).

A plaintiff must also show that she suffered an adverse employment action as a result of the alleged speech, which cannot be shown by a plaintiff who quits her employment. *See, e.g., Akins v. Fulton County*, 420 F.3d 1293, 1300-03 (11th Cir. 2005); *Thomas v. Schafer*, 2008 WL 2441040, at *8-10 (M.D. Ala. June 16, 2008). Constructive discharge is an adverse employment action, but only in cases where a reasonable person in plaintiff's position would have quit. *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998); *see also O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810-11 (8th Cir. 2008) (the burden of proving constructive discharge in Title VII discrimination cases is "'quite high'")[9] (citation omitted). Importantly, "unequal pay cannot, standing alone, constitute a constructive discharge." *See Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978 (11th Cir. 2003). If a plaintiff cannot support a hostile work environment claim, she cannot show a constructive discharge, either. *See, e.g., Davis v. Dunn Constr. Co.*, 872 F. Supp. 2d 1291, 1319 (N.D. Ala. 2012). Finally, "the fact that an employee who claims constructive discharge gives her employer many week's [*sic*] notice before resigning strongly suggest[s] that the conditions to which she allegedly [was] subjected were not intolerable." *Henderson v. Leroy Hill Coffee Co.*, 2001 WL 103147, at *11 (S.D. Ala. Jan. 30, 2001); *see also Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1394 (M.D. Ala. 1997) (three weeks' notice "strongly suggests that the conditions . . . were not intolerable"); *Harper v. ULTA Salon Cosmetics & Fragrance, Inc.*, 2007 WL 528088, at *34 (N.D. Ga. Feb. 13, 2007) (eight days' notice indicates that work environment was not intolerable).

---

[9] The constructive discharge analysis is the same for Title VII and § 1983 claims. *See, e.g., Brantley v. City of Macon*, 390 F. Supp. 2d 1314, 1323 n.2 (M.D. Ga. 2005).

"A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation[,]" especially when the employee never complains about the alleged offensive behavior. *See Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996); *Mitchell v. Pope*, 189 F. App'x 911, 914 (11th Cir. 2006); *Henderson*, 2001 WL 103147, at *11. In other words, "[a]n employee has the responsibility to act reasonably before choosing to resign, and then labeling that resignation as a constructive discharge." *See Henderson*, 2011 WL 103147, at *11 (*citing Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)).

Youngblood's First Amendment retaliation claim fails at the most fundamental level because although she pled that her alleged "speech" related to pay discrimination, she admitted in deposition that she never complained about discrimination to anyone and thus never engaged in any "speech" at all, protected or otherwise. (*See e.g.*, Pltf dep., 169:19-170:11, 171:7-23, 198:9-16, 212:11-15); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (plaintiff may not rely on general complaint allegations to overcome summary judgment); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Regardless, any alleged "speech" does not qualify as speech on a matter of public concern. (*See* Doc. 58, at p.10; Doc. 61, at pp. 7-8); *Morgan*, 6 F.3d at 754-55.

Youngblood also cannot show an adverse employment action. While she makes generalized allegations, she cannot meet the high burden of showing a constructive discharge. After all, she had already decided to retire before she ever found out about Glover's salary and alleged unequal pay is an insufficient basis for a constructive discharge claim, anyway. *See Fitz*, 348 F.3d at 978. Further, as discussed in § IV. below, Youngblood's allegations fall well short of a hostile work environment. *See, e.g.*, *Davis*, 872 F. Supp. 2d at 1319. Tellingly, Youngblood

worked for almost two months after announcing her retirement, which demonstrates that her working conditions were not intolerable. *See, e.g., Henderson*, 2001 WL 103147, at *11. Finally, Youngblood admits that she never complained about any alleged intolerable conditions until after she retired from the College, which belies her *ex post facto* cry of constructive discharge. *See, e.g., Mitchell*, 189 F. App'x at 914.

III.   **Youngblood cannot establish a *prima facie* case of Title VII retaliation (Count Three).**

Youngblood's EEOC charges are devoid of any allegation that she complained or engaged in protected activity, let alone, facts that suggest retaliation. On that ground alone, Youngblood's Title VII retaliation claim is due to be dismissed. (*See* Doc. 58, at pp. 8-9; Doc. 61, at p.6.) Youngblood also cannot state a retaliation claim based on the filing of her EEOC charge as alleged in her Second Amended Complaint (*see* ¶ 86), since she was no longer employed at the College when she filed that charge. Therefore, the College could not have retaliated against her as a result of that charge. *See Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Regardless, Youngblood cannot prove *prima facie* retaliation. To do so, she must show that: (1) she engaged in Title VII protected activity; (2) she suffered an adverse employment action; and (3) "but-for" causation, that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533; *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). For Title VII protected activity, she must show that she engaged in "opposition." *See Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. 271, 276 (2009). An "employee must, at the very least, communicate [her] belief that discrimination is occurring . . . and [cannot] rely on the employer to infer that discrimination has occurred." *Hawk v. Atlanta Peach Movers, Inc.*, 2011 WL

1533024, at \*8-9 (N.D. Ga. Apr. 21, 2011) (citation and quotation marks omitted) (no protected expression under Title VII because employee did not inform his employer that he had been subjected to race discrimination); *Sridej v. Brown*, 361 F. App'x 31, 35 (11th Cir. 2010) ("The employee's statements . . . must be about race or gender discrimination . . . ."); *Brown v. City of Opelika*, 211 F. App'x 862, 863-64 (11th Cir. 2006) (general complaint of unfair treatment does not rise to the level of protected activity for purposes of a retaliation claim).

There is no genuine issue of material fact that Youngblood never engaged in Title VII protected activity while employed at the College. (*See, e.g.*, Pltf dep., 169:19-170:11, 171:7-23, 198:9-16, 212:11-15); *Hawk*, 2011 WL 1533024, at \*8-9. Even if she had, she has adduced no evidence to overcome the stringent but-for causation standard for retaliation claims. *See Nassar*, 133 S. Ct. at 2533. Finally, Youngblood cannot prove an "adverse employment" action for the same reason as discussed in § II.[10] *See, e.g., Brantley v. City of Macon*, 390 F. Supp. 2d 1314, 1323 n.2 (M.D. Ga. 2005) ("Plaintiff's hostile work-environment and constructive discharge claims under §§ 1981, 1983 and Title VII are to be treated the same for the purposes of summary judgment.").

IV.   **Youngblood's allegations do not rise to the level of hostile work environment on account of her race or gender (Counts One and Two), and such claims are barred by Youngblood's failure to exhaust administrative remedies.**

Federal employment laws do not operate "as a 'general civility code.'" *Lockett v. Choice Hotels, Int'l, Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009); *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 80-81 (1998). Instead, Title VII prohibits only the type of severe or pervasive harassment that "alter[s] the conditions of the victim's employment." *See Oncale*, 523 U.S. at 81. Therefore,

---

[10] Youngblood also cannot show that she filed her EEOC charge within 180 days of any alleged retaliatory conduct, which is another fatal flaw with this claim. *See* 42 U.S.C. § 2000e-5(e).

23

> [t]o establish a hostile work environment claim, [a plaintiff] must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment [was] based on [her race or gender]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (citation, quotation marks, and brackets omitted). "Determining whether the harassment was sufficiently severe or pervasive involves 'both an objective and subjective component.'" *Id.* (citation omitted). "The harassing conduct must create both an objectively hostile or abusive environment-one 'that a reasonable person would find hostile or abusive'-and a subjectively hostile or abusive environment-one that 'the [plaintiff] subjectively perceive[s] . . . to be abusive.'" *Fleming v. Boeing Co.*, 120 F.3d 242, 245 (11th Cir. 1997) (citation omitted). "In determining the objective element, a court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann*, 526 F.3d at 1378. (citation and quotation marks omitted).

Where the evidence, "viewed in the totality of the circumstances, [fails to] establish humiliation or physical threat[,]" summary judgment is due to be granted in the employer's favor because the plaintiff cannot meet her burden of showing "with specificity that the overall atmosphere . . . was charged with racial hostility." *Buckhanon v. Huff & Assocs. Constr. Co., Inc.*, 506 F. Supp. 2d 958, 967-68 (M.D. Ala. 2007). "[S]poradic and isolated" conduct, even if offensive, will not support a hostile work environment claim. *See McCann*, 526 F.3d at 1379; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

As recognized by the Supreme Court:

'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'

*These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'* Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace . . . .' We have made it clear that conduct must be extreme . . . .

*Faragher*, 524 U.S. at 788 (citations omitted) (emphasis added); *see also, e.g., Alexander v. Opelika City Schs.*, 352 F. App'x 390, 391-93 (11th Cir. 2009).  Moreover, an employer is not liable for co-worker harassment absent evidence that the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action.  *See Fleming*, 120 F.3d at 246-47.  Finally, an employer is due summary judgment if it shows that "(1) it 'exercised reasonable care to prevent and correct promptly any . . . harassing behavior'; and (2) the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided.'"  *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007) (citation omitted); *see also Faragher*, 524 U.S. at 807-08.

Youngblood's Title VII hostile work environment claim is barred as outside the scope of her EEOC charges because there is not one mention of harassing behavior in either of her two EEOC charges.[11]  (*See* Doc. 58, at p.9; Doc. 61, at p.7); *Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 588 (11th Cir. 2007).  Regardless, Youngblood's allegations regarding unfair workload, the Wallace-gram, and the like do not rise anywhere close to the level of a hostile work environment.  (*See supra*, pp. 13-14); *Alexander v. Opelika City Schs.*, 352 F. App'x at 391-93.  Rather, they amount to nothing more than ordinary tribulations of the workplace that do not implicate federal law.  *See Faragher*, 524 U.S. at 788; *see also McCann*, 526 F.3d at 1379.  By Youngblood's own

---

[11] In addition, Youngblood cannot challenge any act that occurred more than 180 days from when she filed her charge of discrimination with the EEOC.  *See* 42 U.S.C. § 2000e-5(e).

admission, none of the alleged harassment interfered with her work performance. (*See, e.g.*, Sec. Am. Compl., Doc. 57, at ¶ 26.)

To the extent that her claim is based on Glover's alleged conduct, Youngblood's claim likewise fails because there is no basis for holding the College liable. Youngblood admits that she <u>never</u> complained to anyone about anyone while she was employed at the College. (*See, e.g.*, Pltf dep., 169:19-170:11; *see also supra*, pp. 13-14.) She never once gave the College the opportunity to correct any alleged behavior that she now claims contributed to a hostile work environment. Her first mention of such behavior was in her Complaint, long after she had retired from the College. *See Fleming*, 120 F.3d at 246-47. Finally, the College employed multiple avenues to prevent and correct harassment, of which Youngblood was aware but never took advantage. (*See, e.g.*, *supra*, pp. 13-14.) Youngblood's failure to take advantage of the College's complaint procedures is yet another reason why summary judgment on the harassment claim is warranted. *See Baldwin*, 480 F.3d at 1303.

**V.     Youngblood's Title VII race and gender discrimination claims (Counts One and Two) do not survive summary judgment because she has failed to identify proper comparators and because the College had legitimate, non-discriminatory reasons for its actions, which Youngblood cannot show were pretextual.**

To make out *prima facie* Title VII disparate pay, "a plaintiff must show that 'she occupie[d] a position similar to that of a higher paid employee who [wa]s not a member of her protected class.' . . . . The employee whom the plaintiff identifies as a comparator 'must be similarly situated *in all relevant respects*.'"[12] *See Drake-Sims v. Burlington Coat Factory*

---

[12] The Eleventh Circuit's decision regarding comparator evidence in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), does not apply here. Unlike in *Smith*, where there was specific documentary evidence that race was taken into account in disciplinary decisions, there is no "convincing mosaic of circumstantial evidence" from which a jury could infer intentional discrimination against Youngblood by any College employee on account of any protected basis. *See id.* at 1328; *Brown v. Berg Spiral Pipe Corp.*, 2011 WL 3610646, at *15 (S.D. Ala. Aug. 17, 2011) (finding *McDonnell Douglas* applicable because "the circumstantial evidence that [plaintiff] has provided falls short in comparison to the significant record provided by the *Lockheed* plaintiff, and certainly does not form a 'convincing mosaic'").

*Warehouse of Ala., Inc.*, 330 F. App'x 795, 803 (11th Cir. 2009) (citations omitted). This "mean[s] that '[t]he comparator must be nearly identical to the plaintiff.'" *Id.* (citation omitted). Employees with different positions and/or job responsibilities are not similarly situated. *See, e.g.*, *Welch v. Mercer Univ.*, 304 F. App'x 834, 837 (11th Cir. 2008); *Sumerlin v. AmSouth Bank*, 242 F. App'x 687, 690 (11th Cir. 2007). Likewise, employees with different supervisors are not similarly situated. *See, e.g.*, *Foster v. Mid State Land & Timber Co.*, 2007 WL 3287345, at *19 n.21 (M.D. Ala. Nov. 5, 2007); *Davis v. Dunn Constr. Co.*, 872 F. Supp. 2d 1291, 1310 (N.D. Ala. 2012); *see also, e.g.*, *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001). Finally, it is axiomatic that the comparator must actually work for the same employer. *See, e.g.*, *Tate v. Ancell*, 2014 WL 186353, at *10 (7th Cir. Jan. 17, 2014).

"Once a *prima facie* case is established, the defendant must articulate a legitimate, non-discriminatory reason for the pay disparity." *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citation and quotation marks omitted). "This intermediate burden is 'exceedingly light.'" *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (citation omitted). Once it is met, "the inference of discrimination [created by plaintiff's *prima facie* case] drops out of the case entirely," *Holder v. Nicholson*, 287 F. App'x 784, 791 (11th Cir. 2008), and the burden shifts back to the plaintiff to establish that the employer's reason is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Pretext must be shown "by a preponderance of the evidence," and "[t]he ultimate burden of persuading the court that the defendant employer intentionally discriminated against the plaintiff remains, at all times, upon the plaintiff." *Moulds v. Wal-Mart Stores, Inc.*, 935 F.2d 252, 254 (11th Cir. 1991).

It is well-settled that an employee's disagreement with her employer's business decision is not enough to show pretext. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.

2000).  Likewise, "[j]ust as plaintiffs are not allowed to recast an employer's proffered reason, so also should courts refrain from doing so."  *See id.* at 1030 n.19.  The Court's role is limited to determining whether a defendant's proffered reason for a challenged employment decision was the real reason.  *See id.*  In doing so, the Court may not substitute its judgment for that of the employer; its sole focus "is whether unlawful discriminatory animus motivate[d] the decision."  *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  The Court does not "sit as a 'super-personnel department,' and it is not [the Court]'s role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."  *Id.*  (citation omitted).  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Id.*

Youngblood's Title VII race and gender discrimination claims fail on multiple grounds, including (1) Youngblood has failed to identify a proper comparator other than Glover, and (2) the College had a legitimate, non-discriminatory reason for paying Glover more than Youngblood, which she cannot show was pretextual.[13]

### A.   Kimberly Johnson and Benjamin Craig are not proper comparators.

Kimberly Johnson is not a proper comparator because, while she performs some of the same tasks as Youngblood performed, she is in a different position altogether with additional responsibilities.  (*See, e.g.*, Pltf dep., 214:5-216:8, Wilkins dep., 55:19-59:13, 199:2-201:2, Ex. 29, at ¶¶ 8-11, Ex. 31; *see also supra*, pp. 10-11); *Welch*, 304 F. App'x at 837; *Sumerlin*, 242 F.

---

[13] Youngblood's Title VII, § 1983, and § 1981 claims are all subject to the same analytical framework.  *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009); *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010); *Ezekiel v. Tift County Sch. Dist.*, 2010 WL 3456135, at *5 (M.D. Ga. Aug. 27, 2010).  Thus, to the extent the Court does not dismiss Youngblood's § 1983 and § 1981 claims on immunity or the other grounds discussed herein, Defendants are due summary judgment on those claims for the same reasons as they are due summary judgment on Youngblood's Title VII claims.

App'x at 690.  Johnson's job duties, not her job description, are what are relevant for comparator purposes, and there is no dispute that she has different duties than Youngblood.  (*See supra*, pp. 10-12); *Hooper v. Total Sys. Servs., Inc.*, 799 F. Supp. 2d 1350, 1364 (N.D. Ga. 2011); *Chepak v. Metro. Hosp.*, 2014 WL 552682, at *2 (2d Cir. Feb. 13, 2014) (job content, and not job title or description, is determinative); *Montgomery v. Clayton Homes, Inc.*, 2003 WL 1922917, at *2 (5th Cir. Mar. 25, 2003) (same).

Similarly, Benjamin Craig (or any employee from another college) is not a proper comparator because he was not employed by the same employer and there is no evidence that he ever had the same supervisor.  (*See supra*, p.12; *see also* Josey Aff., ¶ 2); *Tate*, 2014 WL 186353, at *10; *Foster*, 2007 WL 3287345, at *19 n.21.  Furthermore, Craig is not a suitable comparator because his position had additional and more demanding job responsibilities.  *See, e.g.*, *Welch*, 304 F. App'x at 837; *Sumerlin*, 242 F. App'x at 690.

As such, the only conceivable comparator for Youngblood's race and gender discrimination claims is Wade Glover.

**B.**   **The College had a legitimate, non-discriminatory reason for paying Wade Glover and Kimberly Johnson more, which Youngblood cannot show was pretextual.**

The College has articulated a legitimate, non-discriminatory reason for paying Wade Glover more, namely, the College's practice not to lower pay when it transfers a person.  (*See* Wilkins dep., 73:5-21, 77:5-14, Ex. 29 at ¶ 3; Young dep., 153:11-23, 163:1-9; *see also supra*, p.9.)  Youngblood's disagreement with this decision or practice does not amount to pretext and she has no evidence that the College's reason for maintaining Glover's salary was not the real reason.  *See Chapman*, 229 F.3d at 1030.

As demonstrated above, Johnson did not hold the same position as Youngblood. Even if Johnson were a proper comparator, Youngblood cannot show pretext with respect to the College's decision to place the Duplications Technician position on the E4 salary schedule. The College made this salary placement decision based on the additional job duties associated with the new position, which is a legitimate, non-discriminatory reason. Furthermore, the salary for the newly-created Duplications Technician position was set prior to hiring anyone into the position and clearly without reference to the race of the person who was hired into the position. There is no dispute that Johnson, a white female, was the only qualified applicant to apply for the position. *See, e.g., Brooks v. CSX Transp., Inc.*, 2014 WL 480382, at *3 (11th Cir. Feb. 7, 2014) ("The sole 'evidence' [plaintiff] relies on is that the person who received the job was white. This fact alone . . . is insufficient to show a genuine issue of fact as to pretext, because it does not establish falsity or that the true reason . . . was an impermissible one.").

VI.   **There is no triable claim on Youngblood's EPA claim (Count Seven) because the undisputed facts show that any pay disparity between Glover and Youngblood was based on a factor other than sex.**

To state a *prima facie* EPA claim, a plaintiff must show that her employer pays different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort, and responsibility, and which are performed under similar working conditions. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). "The EPA requires, among other things, that the plaintiff's comparators be employees of the same employer." *See Benjamin v. Holy Cross Hosp., Inc.*, 2013 WL 1334565, at *7 (S.D. Fla. Mar. 29, 2013); *see also* 29 U.S.C. § 206(d) ("No *employer* having employees subject to any provisions of this section shall discriminate . . . within any establishment in which such *employees are employed* . . . .") (emphasis added).

30

The employer can then show "that the differential is justified by one of four exceptions set forth in the EPA . . . ." *See Irby*, 44 F.3d at 954. "Those exceptions are: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* (*quoting* 29 U.S.C. § 206(d)(1)). If the defendant does so, "the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *See Irby*, 44 F.3d at 954.

"The term 'red circle' describes 'certain unusual, higher than normal, wage rates which are maintained for many reasons.'" *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 595 (11th Cir. 1994) (citation omitted). "Congress intended to include this practice as a factor other than sex that explains a wage differential and constitutes an affirmative defense." *Id.* When the plaintiff's comparator is "a legitimately red circled employee[,] the employer has an affirmative defense. *See id.* at 596.

The EPA's interpretive regulations state that "[a]n example of bona fide use of a 'red circle' rate might arise in a situation where a company wishes to transfer a long-service employee, who can no longer perform his or her regular job because of ill health to different work which is now being performed by opposite-gender employees." 29 C.F.R. § 1620.26(a).[14] "Under the 'red circle' principle the employer may continue to pay the employer his or her present salary, which is greater than that paid to the opposite gender employees, for the work both will be doing." *Id.* "Under such circumstances, maintaining an employee's established wage rate, despite a reassignment to a less demanding job, is a valid reason for the differential

---

[14] 29 C.F.R. § 1620.26(b), which refers to temporary reassignments, is inapplicable in this action because Glover was permanently assigned to the print shop. Further, the regulations merely provide illustrations, not exclusive categories, of legitimately maintained red circle rates. *See Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 844 (6th Cir. 1997).

even though other employees performing the less demanding work would be paid at a lower rate, since the differential is based on a factor other than sex." *Id.*

Youngblood's alleged EPA comparators are Wade Glover and Benjamin Craig. Again, Craig (or any other non-College employee) is not a proper comparator since he was never employed by the College. *See Benjamin*, 2013 WL 1334565, at *7. Regardless, Craig had different job duties altogether and did not perform equal work. *See, e.g.*, *Rollins v. Ala. Cmty. Coll. Sys.*, 814 F. Supp. 2d 1250, 1315 (M.D. Ala. 2011) (granting summary judgment on EPA claim where plaintiff failed to show that her job duties were substantially equal to her alleged comparators); *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1281-82 (M.D. Ala. 2011) (no proper comparator where plaintiff "failed to establish that she and [alleged comparator] performed substantially the same duties in their respective positions").

The College paid Glover, a long-service employee, more based on a factor other than sex, *i.e.*, Glover retained his E4 salary from his position as Supervisor of Grounds Maintenance upon his reassignment to the print shop as a result of the College's concerns regarding his health, which is consistent with the College's practice and the red circle principle. *See Mulhall*, 19 F.3d at 595 (numerous courts, including the Eleventh Circuit, "acknowledge red-circling where current employees are transferred to lower paying positions but retain their higher pay"); 29 C.F.R. § 1620.26(a); *see also, e.g.*, *Fenton v. St. Lawrence County*, 828 N.Y.S.2d 647, 648-49 (N.Y. App. Div. 2007) (affirming summary judgment on EPA claim where employer paid male employee a higher salary based on maintaining him at the level of his previous higher salaried position). Youngblood has no evidence that this reason is pretextual, because it is not. *See Irby*, 44 F.3d at 954. Therefore, the College is due summary judgment on Youngblood's EPA claim.

**VII.    At a minimum, Defendants are due partial summary judgment on Youngblood's EPA, Title VII, and § 1983 claims based on the applicable statutes of limitation.**

While the EPA (unlike Title VII) does not require proof of discriminatory intent, a plaintiff can only recover damages for disparate pay for two years prior to her last paycheck, unless she shows a willful EPA violation, in which case she can recover damages for disparate pay for three years prior to her last paycheck.  *See* 29 U.S.C. § 255(a); *Slattery v. Precision Response Corp.*, 167 F. App'x 139, 142 n.1 (11th Cir. 2006); *Burch v. P.J. Cheese, Inc.*, 935 F. Supp. 2d 1259, 1279-80 (N.D. Ala. 2013); *Maledy v. City of Enterprise*, 2012 WL 1028176, at *7 (M.D. Ala. Mar. 26, 2012) (Thompson, J.).  For the three-year limitations period to apply, a plaintiff must show that her employer knew or showed reckless disregard as to whether its conduct was prohibited by the EPA.  *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 131-35 (1988).

Youngblood is claiming damages from 2001 through 2011.  (*See* Statement of Damages, at p.3.)  Even if Youngblood could prove a *prima facie* case under the EPA, she can only recover for disparate pay for the two years prior to her last paycheck on October 31, 2011.[15]  *See* 29 U.S.C. § 255(a).  She "offers absolutely no evidence to support a finding of willfulness in this case."  *See Hankins v. Title Max of Ala., Inc.*, 2006 WL 4393576, at *3 (N.D. Ala. Sept. 26, 2006).  Thus, even if the Court finds she was discriminated against in pay, there is still no evidence that the College "did so with any gender discriminatory intent.  Therefore, the three year statute of limitations period is inapplicable."  *See id.*

---

[15] Youngblood's expert witness mistakenly asserts that the Lilly Ledbetter Fair Pay Act removed the statute of limitations in EPA cases.  While that Act changed when a pay disparity claim accrues, *i.e.*, the statute of limitations begins to run upon receipt of each paycheck (as opposed to when the original pay decision was made), the Act does not allow a plaintiff to recover for alleged disparate paychecks indefinitely and beyond the EPA statute of limitations.  *See, e.g., Clark v. U.S. Postal Serv.*, 2011 WL 7429932, at *3 (M.D. Fla. Dec. 13, 2011).  Since Youngblood received her last paycheck on October 31, 2011, she can only recover for disparate pay from October 31, 2009 because she has no evidence of any willful violation.  Even if she did, the most she could recover would be for disparate pay from October 31, 2008.

Similarly, even if she could prove a *prima facie* Title VII case, she can only recover back pay for the two-year period prior to the filing of her EEOC charge. *See* 42 U.S.C. § 2000e-5. Youngblood alleges in her Second Amended Complaint that "[o]n more than one occasion, plaintiff requested proper salary placement for the duties she was performing, but she was denied proper placement." (*See* ¶ 72.) Youngblood's requests were all made in the late 1990s and Youngblood admits that she never filed an EEOC charge based on any review of her pay. Youngblood cannot state a Title VII claim with respect to any of those reviews because she failed to file an EEOC charge within 180 days of the alleged conduct.

Likewise, while Youngblood's expert witness has stated that he believes the decision not to include an associates degree as an educational requirement for her job back in 2000 was "arbitrary," Youngblood never filed an EEOC charge or complaint regarding that decision, either. Thus, to the extent any of her claims are based on that decision, such claims are barred by the applicable statute of limitations discussed above, Youngblood's failure to exhaust administrative remedies, and/or her lack of comparator with respect to that claim.

Finally, under § 1983, Youngblood can only recover for disparate pay for the two-year period prior to the filing of her Complaint. *See Puckett v. Pettway*, 2007 WL 2784415, at *2 (M.D. Ala. Sept. 24, 2007) (Thompson, J.). With respect to her First Amendment retaliation claim under § 1983, as discussed in § II. above, Youngblood has not shown that she engaged in any protected conduct or suffered any adverse employment action. Even so, she cannot recover for any "adverse act" outside of the two-year statute of limitations.

## CONCLUSION

Despite the numerous legal theories alleged in the Second Amended Complaint and the numerous defendants sued in this action — when the dust settles – there is no genuine issue of material fact to present to a jury in this case.  For all of these reasons, summary judgment is due to be granted in favor of Defendants.

Respectfully Submitted,

*/s/ Mark T. Waggoner*
MARK T. WAGGONER (WAGGM3310)

OF COUNSEL:

HAND ARENDALL LLC
1200 Park Place Tower
2001 Park Place North
Birmingham, Alabama  35203
Telephone:    (205) 324-4400
mwaggoner@handarendall.com

*/s/ Lisa Darnley Cooper*
LISA DARNLEY COOPER (COOP8509)

HAND ARENDALL LLC
RSA Tower, Suite 30200
11 North Water Street
Mobile, Alabama  36602
Telephone:    (251) 432-5511
ldcooper@handarendall.com

## CERTIFICATE OF SERVICE

I certify that on March 12, 2014, I have served the foregoing pleading on counsel of record by the Court's electronic filing system or by placing the same in U.S. First Class Mail postage prepaid and properly address to the following:

Nancy E. Perry, Esq.
Alabama Education Association
P. O. Box 4177
422 Dexter Avenue
Montgomery, AL 36103
Nancyp@alaedu.org

W. Don Eddins
337 E. Magnolia Avenue
Auburn, AL 36830
doneddins@auburnlaw.us

David O'Brien, Esq.
Jeffrey Miller, Esq.
Alabama Dept. of Postsecondary Education
135 South Union Street
Montgomery, AL 36104
David.obrien@dpe.edu
Jeffrey.miller@dpe.edu

*/s/ Lisa Darnley Cooper*

596860_1