IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| LUCILLE YOUNGBLOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:13cv33-MHT |
| | ) | (WO) |
| GEORGE C. WALLACE STATE | ) | |
| COMMUNITY COLLEGE and | ) | |
| LINDA C. YOUNG, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

Plaintiff Lucille Youngblood brought this action

against defendants George C. Wallace Community College

("WCC") in Dothan, Alabama and college president Linda C.

Young.[1]  Youngblood asserts violations of the Equal Pay

Act of 1963, as amended (29 U.S.C. § 206(d)), Title VII

of the Civil Rights Act of 1964, as amended (42 U.S.C. §§

1981a & 2000e to 2000e-17), the Equal Protection Clause

---

1. Youngblood refers to the community college as
George C. Wallace State Community College.  However, the
community college, which is located in Dothan Alabama,
refers to itself as George C. Wallace Community College
or WCC.

of the Fourteenth Amendment (as enforced by 42 U.S.C. § 1983), and 42 U.S.C. § 1981 (as enforced by 42 U.S.C. § 1983).  Subject-matter jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), as well as 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 29 U.S.C. § 216(b) (Equal Pay Act).  The cause is before the court on the defendants' motion for summary judgment.  For the reasons that follow, the motion will be denied.

## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the

2

non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II. BACKGROUND

Youngblood alleges that WCC paid her less than she deserved, and less than other comparable employees earned, all because she is a black woman.

Youngblood worked for colleges in Alabama's two-year college system for approximately 25 years, from when she was a student at WCC in 1986 through her retirement in 2011. For the first ten years, until 1996, she was employed at the Alabama Aviation and Technical College. In late 1997, the aviation college and WCC merged. Youngblood was reassigned to the WCC print shop in early 1998. The two colleges subsequently separated in 2003, but Youngblood remained at WCC until her retirement in 2011. Young became president of the community college in 1999, not long after Youngblood transferred there.

Alabama's two-year college system used, and continues to use, a system of salary schedules for its employees. Much of this case concerns Schedule E, which contains various 'levels,' such' as 'E4, 05' or 'E5, 07'. An employee's level is supposed to be determined by reference to the employee's job description and responsibilities. In addition, each employee is assigned a 'step,' from 0 to 27, depending on experience. The employee's salary is a product of her salary schedule and step.

After her arrival at WCC, Youngblood's salary schedule was evaluated by Dr. Keith Ward, an outside job-classification consultant. He concluded that schedule E5, 07 was appropriate for Youngblood's job. Ward reviewed her job at least four times altogether, and always reached the same conclusion.

In 2000, Youngblood's supervisor in the print shop, John Herring, retired. The administration approached Youngblood about taking over the supervisor position, but

4

at that time she declined.   Later, when the college posted a formal job announcement, she had a change of heart and applied.   The supervisor position was not filled.   Instead, Dean Mark Shope, who had supervised Herring, took over direct supervision of the print shop.

Shortly thereafter, a white male employee named Wade Glover was reassigned to the print shop at the request of Dean Shope and Dean Lynn Bell and with President Young's approval.   Glover had previously been employed as a supervisor of grounds and maintenance, on the higher E4, 05 salary schedule.   Shope and Bell noted that, upon Glover's transfer to the print shop, "There will be no salary adjustment."   Memorandum (Doc. No. 78-2) at 36. The documentary evidence does not reflect the reason for this transfer, but the defendants have offered testimony that it was on account of Glover's health.   According to testimony from WCC personnel, the maintenance of Glover's salary was pursuant to the community colleges's policy of not reducing salaries as a result of transfers.

Glover and Youngblood both worked in the print shop from October 2000, until Youngblood's retirement on November 1, 2011.  Glover retired shortly after that. Before Glover's arrival, various documents had referred to Youngblood by different job titles, including "Duplicating Clerk," "Duplications Clerk," and "Duplications Technician."  See, e.g., Contract (Doc. No. 81-8) at 14; Memorandum (Doc. No. 70-1) at 112.  In 2001, Shope indicated that the proper title for both Youngblood and Glover was "Printing/Duplication Technician." Memorandum (Doc. No. 77-5) at 2.  They both maintained that title until their respective retirements.  Neither was in the position of supervising the other.

Glover maintained his higher E4, 05 salary schedule associated with his previous position as a supervisor of grounds and maintenance throughout this time, while Youngblood remained at the E5, 07 schedule assigned to the Printing/Duplication Technician position.  President

6

Young signed the employment contracts for both Youngblood and Glover, containing their different salary schedules.

Shortly after Youngblood's notice that she would be retiring in late 2011, WCC prepared a job announcement for the position of "Duplications Technician."  2011 Announcement (Doc. No. 79-9) at 2.  When no allegedly qualified individuals applied, the college prepared a new announcement, again for a "Duplications Technician" but this time with less demanding educational qualifications. 2012 Announcement (Doc. No. 79-10) at 2.  Both announcements set the position's salary at E4, 05. Eventually, Kimberly Johnson, a white woman, was hired for the new position.  Since Glover retired, Johnson has been working alone in the print shop.

Youngblood learned of Glover's higher pay in October 2011, after she had announced her retirement.  Around the same time she also became aware of the higher salary schedule for the position announced when she was preparing to retire.  Thereafter, Youngblood filed a

charge with the Equal Employment Opportunity Commission ("EEOC") and the instant lawsuit.

## III. DISCUSSION

Youngblood asserts the following claims: sex discrimination in pay by WCC in violation the Equal Pay Act; race and sex discrimination in pay by the community college in violation of Title VII; race and sex discrimination in pay by Young in her individual capacity in violation of the Equal Protection Clause; and race discrimination in pay by Young in her individual capacity in violation of § 1981.[2]  The defendants move for summary

_____

2. Youngblood had named a number of other defendants as well, but the parties stipulated to their dismissal. See Stipulation (Doc. No. 86); Judgment (Doc. No. 87); Order (Doc. No. 103).  The dismissed defendants are: Chancellor Mark A. Heinrich, former Chancellor Frieda Hill, the Alabama Department of Postsecondary Education, the Alabama State Board of Education, Governor Robert Bentley, Randy McKinney, Gary Warren, and State Board of Education members Charles Elliott, Betty Peters, Stephanie W. Bell, Yvette Richardson, Ella B. Bell, Jeffery Newman, Tracy Roberts, and Mary Scott Hunter. Youngblood also stipulated to the dismissal of Young in her official capacity.  See Order (Doc. No. 104).
(continued...)

judgment on a variety of grounds.[3]  The court will group and address those arguments by the claims to which they apply.

## A.  Equal Pay Act

The Equal Pay Act, a portion of the Fair Labor Standards Act, prohibits sex discrimination in the form of unequal pay "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1).  To establish a prima-facie case, "a plaintiff must show 'that an employer pays different wages to employees of opposite

_____

2. (...continued)
Youngblood's retaliation claims were previously dismissed by stipulation of the parties.  See Stipulation (Doc. No. 86); Judgment (Doc. No. 87).  Finally, Youngblood stipulated that she is not alleging any claim of a hostile-work environment or constructive discharge.  See Order (Doc. No. 104).

3. In their briefing, the defendants also make arguments for summary judgment regarding the dismissed claims and defendants; those arguments are now moot.

9

sexes'" for such equal work. Schwartz v. Florida Bd. of
Regents, 807 F.2d 901, 907 (11th Cir. 1987) (quoting
Corning Glass Works v. Brennan, 417 U.S. 188, 195
(1974)).  "Once plaintiff has established a prima facie
case, the burden shifts to the employer to prove that the
difference in pay is justified by one of the four
exceptions to the Equal Pay Act: (i) a seniority system;
(ii) a merit system; (iii) a system which measures
earnings by quantity or quality of production; or (iv) a
differential based on any factor other than sex."
Schwartz, 807 F.2d at 907 (internal quotation marks
omitted); see also 29 U.S.C. § 206(d)(1).  To carry their
burden, "[d]efendants must show that the factor of sex
provided no basis for the wage differential," Schwartz,
807 F.2d at 907, and this "burden is a heavy one."
Mulhall v. Advance Sec., Inc., 19 F.3d 586, 590 (11th
Cir. 1994).  Because the four statutory exceptions
"constitute affirmative defenses," if a defendant proves

10

one of them he "is absolved of liability as a matter of law." Id.

The community college has not argued that Youngblood failed to make a prima-facie case, and the court finds that she has made such a showing. It is undisputed that Glover, a male employee of the community college, earned more than Youngblood, a female employee, during the entire eleven-year period that they both worked in the print shop. Their jobs were somewhat different: Glover was primarily responsible for offset printing, which involves manual printing on a printing press, while Youngblood's responsibilities focused on printing and binding of electronic materials. According to her testimony, she also had a range of additional responsibilities including computer programing, negotiations with vendors, accounting and budgeting, troubleshooting, and even offset printing. "The jobs held by the employees of opposite sexes need not be identical; rather, they need only be substantially

11

equal." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992).  In this case, with the evidence considered in the light most favorable to Youngblood, it is clear that her job was substantially equal to Glover's, and to the extent they differed Youngblood had more responsibilities.

The community college's principal argument regarding this claim goes instead to the affirmative defense.  It argues that Glover was kept at his original, higher salary after transferring to the print shop based not on his sex but on the community college's policy of not lowering employees' salaries upon transfer.  It goes on to argue that the decision to transfer him was, in turn, also based not on sex, but on concerns that his health was being harmed by his outside grounds and maintenance work.  According to the community college, this justification (namely that it maintained Glover's salary pursuant to its policy after transferring him for health reasons) was "a differential based on any other factor

other than sex," 29 U.S.C. § 206(d)(1)(iv), and
specifically was a legitimate example of the practice of
'red circling.'

"The term 'red circle' describes 'certain unusual,
higher than normal, wage rates which are maintained for
many reasons.'" Mulhall, 19 F.3d at 595 (quoting Gosa v.
Bryce Hospital, 780 F.2d 917, 918 (11th Cir. 1986)).  The
legislative history of the Equal Pay Act indicates that
"Congress intended to include this practice as a factor
other than sex that explains a wage differential and
constitutes an affirmative defense." Mulhall, 19 F.3d at
595.  "Numerous courts, including [the Eleventh Circuit
Court of Appeals], acknowledge red-circling where current
employees are transferred to lower paying positions but
retain their higher pay."  Id.

Youngblood argues that the red-circle principle does
not apply to this case because Glover was transferred on
a permanent, rather than temporary, basis.  In support,
she points to testimony from her expert witness, Dr.

James Buford, that the community college misapplied the red-circle principle by allowing the wage difference to continue perpetually. <u>See</u> Buford Dep. (Doc. No. 75-3) at 19; Buford Notes (Doc. No. 82-12) at 2 ("the red circle principle allows for a time frame for employers to remove the pay disparity...[and] it is not a justification for perpetuating a disparity that has existed over 13 years"). She also cites testimony by the defendants' expert witness, Dr. Toni Locklear, in which she agreed that "ideally the red circle application is intended to be resolved at some point in time." Locklear Dep. (Doc. No. 76-1) at 24.

However, the proper question here is not what the term 'red circle' means to experts on employment and human resources, nor what red-circle practices are reasonable in the industry. Rather, this is fundamentally a matter of statutory construction. Congress intended to include red circling under the fourth affirmative defense to the Equal Pay Act, as a

factor other than sex, see Gosa, 780 F.2d at 918, and so the question is what Congress meant that term to encompass.  That is not a question of fact to be resolved by reference to experts on current practice but a question of law to be decided by the court.[4]

The text of the statute itself is silent on the question of whether red circling must be temporary; indeed, it does not mention red circling at all.  The legislative history contains the following discussion of the red-circle principle:

> "'[The factor-other-than-sex exception] recognizes certain special circumstances, such as "red circle rates."  This term is borrowed from War

---

4. This is not to suggest that no expert evidence would be helpful in resolving this issue.  For example, the legislative history suggests that the term 'red circle' was borrowed from the War Labor Board, see Glenn v. Gen. Motors Corp., 841 F.2d 1567, 1571 (11th Cir. 1988), which was active during World Wars I and II.  See Catherine Lerum, Equal Pay for Women Can Become A Reality: A Proposal for Enactment of the Paycheck Fairness Act, 34 N. Ill. U. L. Rev. 221, 222 (2013).  Certainly historical evidence about the War Labor Board's interpretation of red circling would be helpful to clarify what Congress understood the term to include when it passed the Equal Pay Act.

15

Labor Board parlance and describes certain unusual, higher than normal wage rates which are maintained for many valid reasons. For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs.'"

Glenn v. Gen. Motors Corp., 841 F.2d 1567, 1571 (11th Cir. 1988) (quoting H.R.Rep. No. 309, 88th Cong., 1st Sess. 3, reprinted in 1963 U.S. Code Cong. & Admin. News 687, 689). The single example cited in this passage does involve temporary transfer of personnel, somewhat supporting Youngblood's interpretation.

However, the EEOC's interpretive regulation addressing red-circle rates suggests that Youngblood's argument, that those rates apply to only temporary transfers, is flawed. See 29 C.F.R. § 1620.26. "[A]dministrative interpretations by the EEOC, as the enforcing agency, are entitled to great deference." Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 254

n.127 (5th Cir. 1974) (citing <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971)); <u>see also</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229 (2001) (generally no deference of the type set forth in <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), without delegated authority to promulgate binding regulations); <u>Morgado v. Birmingham-Jefferson Cnty. Civil Def. Corps</u>, 706 F.2d 1184, 1189 n.1 (11th Cir. 1983) (no congressional authorization to promulgate binding regulations under the Equal Pay Act).[5]

As the community college notes, § 1620.26 actually "describe[s] two different examples of red-circling." <u>Arthur v. Coll. of St. Benedict</u>, 174 F. Supp. 2d 968, 976 n.7 (D. Minn. 2001) (Rosenbaum, J.).   Subsection (b), on which Youngblood principally relies, describes the circumstances under which, "[f]or a variety of reasons an employer may require an employee, <u>for a short period</u>, to

_____

5. The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.   <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981)(en banc).

17

perform the work of a job classification other than the employee's regular classification." 29 C.F.R. § 1620.26(b) (emphasis added). Such temporary reassignments, such as the example discussed in the legislative history, may be necessary for a variety of reasons, and unequal wages may be maintained during the short period of time. However, the regulation specifies that "failure to pay the higher rate to a reassigned employee after it becomes known that the reassignment will not be of a temporary nature would raise a question whether sex rather than the temporary nature of the assignment is the real basis for the wage differential," and "[g]enerally, failure to pay the higher rate to an employee reassigned for a period longer than one month will raise questions as to whether the reassignment was in fact intended to be temporary." Id. It is clear from the record that Glover's transfer would not qualify as temporary.

However, subsection (a) of the same regulation is quite different.  After giving a general definition of red circling, the regulation notes that, "An example of bona fide use of a 'red circle' rate might arise in a situation where a company wishes to transfer a long-service employee, who can no longer perform his or her regular job because of ill health, to different work which is now being performed by opposite gender-employees."  29 C.F.R. § 1620.26(a).  "Under such circumstances, maintaining an employee's established wage rate, despite a reassignment to a less demanding job, is a valid reason for the differential even though other employees performing the less demanding work would be paid at a lower rate, since the differential is based on a factor other than sex."  Id.  Obviously, if the higher-paid employee "can no longer perform" his prior job due to health concerns, id., then this might not be a temporary transfer but, rather, a permanent one.

19

Furthermore, the history of the regulation indicates that the EEOC specifically rejected an interpretation that would limit red circling to temporary changes. Section 1620.15 of the 1981 proposed regulation provided for only temporary red circling:

> "(b)  The term 'red circle' rate describes a higher than normal rate given to an employee for exceptional reasons. <u>A red circle rate cannot be used for the purpose of maintaining permanent wage differentials for equal work.</u> A red circle rate is permissible as a factor other than sex in such cases as, for example, temporary reassignment for ill health."

The Equal Pay Act; Interpretations, 46 FR 43848-02, 43852 (emphasis added).  However, during notice and comment "[s]everal commentors objected to subsection (b) of the proposed interpretation ... on the ground that it ... only allow[ed] red circle rates on a temporary basis." The Equal Pay Act; Interpretations, 51 FR 29816-01, 29819.  The Commission concluded that "the language of subsection (b) was unduly rigid" and returned to the language of the prior regulations, which were found at 29

CFR §§ 800.146 and 800.147.  Id.  In other words, the
EEOC rejected as "unduly rigid" the idea that red
circling must be temporary.  Id.

WCC argues that Glover was transferred for just the
reason discussed in 29 C.F.R. § 1620.26(a): because his
health prevented him from working on grounds and
maintenance any more.  However,  with the evidence
considered in the light most favorable to Youngblood,
there is a genuine dispute about whether Glover's health
was the reason for his transfer.  The community college
has offered testimony that this was indeed the reason.
See, e.g.,  Young Dep. (Doc. No. 75-2) at 137 (Glover
"was having trouble dealing with the elements and the
heat and the cold"); Wilkins Dep. (Doc. No. 70-4) at 5
("Dean Lynn Bell had been noticing that Mr. Glover was
having some--some issues dealing with the outside work in
terms of heat. ... Mr. Glover just was not handling the
physical requirements of the position as well as he had

21

been in the past.").[6]  But the community college has cited

no contemporaneous documents reflecting that this was the

reason for the transfer.  See Memorandum (Doc. No. 78-2)

at 36 (requesting and approving Glover's transfer, with

no reason given); see also Bell Aff. (Doc. No. 70-4) at

52, ¶ 3 (discussing Glover's transfer without reference

to health problems).

Also, other evidence in the record severely

undermines the community college's argument that health

was the reason for this transfer.  Youngblood testified

that she never saw Glover struggle to work in the heat

--------

     6. Although Youngblood made no such objection, this
testimony from Ashli Wilkins, designated to testify on
behalf of the community college pursuant to Fed. R. Civ.
P. 30(b)(6), may be subject to objection for lack of
personal knowledge and hearsay.  See, e.g., Sara Lee
Corp. v. Kraft Foods Inc., 276 F.R.D. 500, 503 (N.D. Ill.
2011)(discussing dangers of 30(b)(6) testimony and noting
that a "corporate representative may not repeat 'rank
hearsay'") (quoting Deutsche Shell Tanker Gesellschaft
mbH v. Placid Refining Co., 993 F.2d 466, 473 n. 29 (5th
Cir. 1993)).  Because the court determines there is
genuine dispute on this issue in any event, the court
need not resolve the admissibility of this evidence at
this time.

while he was on grounds and maintenance, and indeed she
had "never seen anybody mow as fast as he mows, so he
didn't act like he had a bit of [a] problem." Youngblood
Dep. (Doc. No. 75-1) at 43.   And Glover himself
categorically denied any health problems limiting his
ability to remain on grounds and maintenance:

> "Q: Did they tell you any reason why you
> were being transferred other than they
> needed somebody in the Print Shop?
>
> "A: No, ma'am.
>
> "Q: Did you have any difficulty
> performing your duties in the
> maintenance department?
>
> "A: No, ma'am.
>
> "Q: Were you having any respiratory or
> any other problems?
>
> "A: No, ma'am.
>
> "Q: Did you have any problems as a
> result of environmental issues?
>
> "A: No, ma'am."

Glover Dep. (Doc No. 76-3) at 7.   A jury could easily
conclude that Glover had no health problems and that,

therefore, the real reason for his transfer lies elsewhere.[7]

The college also alleges that it had a policy of never reducing an individual's salary when he or she was transferred, and it argues that such a policy, even without the health rationale, qualifies as a reason other than sex sufficient for the affirmative defense under the Equal Pay Act.

This argument is foreclosed by binding precedent. The Eleventh Circuit has "consistently held that 'prior salary alone cannot justify pay disparity' under the [Equal Pay Act]." Irby v. Bittick, 44 F.3d 949, 955 (11th Cir. 1995) (quoting Glenn v. Gen. Motors Corp., 841

---

7. WCC argues that Youngblood's and Glover's testimony on this point is not relevant because the question is whether the community college believed Glover was having health issues. However, Youngblood's and Glover's consistent testimony that Glover had no problems, combined with the total lack of any documentation that this was the reason for the transfer, is sufficient to permit a jury to discredit the community college's contentions about what it and its personnel believed at the time. Thus there is a genuine dispute of material fact on this issue.

F.2d 1567, 1571 & n.9 (11th Cir. 1988)).  <u>Glenn</u> is instructive.  In that case, GM claimed to have "a longstanding, unwritten, corporate-wide policy against requiring an employee to take a cut in pay when transferring to salaried positions" from hourly positions.  <u>Glenn</u>, 841 F.2d at 1570.  As a result, the female plaintiffs in that case were paid less than their male comparators, who had transferred from higher-paying hourly jobs in the company.  The Eleventh Circuit rejected this policy as insufficient to establish a factor other than sex for the affirmative defense.  It reviewed the legislative history of the Equal Pay Act, finding that it "indicates that the 'factor other than sex' exception applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from <u>special exigent circumstances</u> connected with the business."  <u>Id</u>. at 1571 (emphasis added).  Thus, in order to afford a defense under the Equal Pay Act, red circling

25

must be done based on the particular circumstances of the individual involved, not a blanket policy of maintaining salaries. "[P]rior salary alone cannot justify pay disparity." <u>Id</u>.

Other courts have disagreed with this conclusion. <u>See, e.g.</u>, <u>Wernsing v. Dep't of Human Servs., State of Illinois</u>, 427 F.3d 466, 468 (7th Cir. 2005); <u>see also</u> <u>Taylor v. White</u>, 321 F.3d 710, 720 (8th Cir. 2003) (declining to follow <u>Glenn</u>'s "bright line prohibition against reliance on prior salary except in limited, exigent circumstances").

But, besides the fact that <u>Glenn</u> is binding in this circuit, this court is of the opinion that it is also correct. "It is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed," <u>Mitchell v. Kentucky Fin. Co.</u>, 359 U.S. 290, 295 (1959), and the community college's alleged policy is difficult to square with the EEOC regulation, which is entitled to "great deference." <u>Pettway</u>, 494 F.2d at 254 n.127. That

regulation goes into detail to establish what temporary
transfers can qualify for red circling, and specifically
provides that "a period longer than one month will raise
questions as to whether the reassignment was in fact
intended to be temporary." 29 C.F.R. § 1620.26(b). Of
course, as discussed above, subsection (a) appears to
contemplate permanent red-circled transfers, but that
subsection also goes into detail about the circumstances
that may justify red circling, suggesting that "a
long-service employee, who can no longer perform his or
her regular job because of ill health" may legitimately
be red circled.   29 C.F.R. § 1620.26(b).   In both
subsections, the regulation refers to "bona fide"
instances of red circling. Id. If a policy authorizing
red circling for all transfers can qualify as bona fide,
one has to wonder why the EEOC felt the need to go into
so much detail. Indeed, if such a policy were enough, it
appears that the regulation could have simply said that
'any salary may be red circled,' so long as sex is not

the reason for the red circle and so long as the red circle does not perpetuate prior sex discrimination. <u>Cf.</u> <u>Corning Glass Works</u>, 417 U.S. at 194 ("This 'red circle' rate served essentially to perpetuate the differential in base wages between" men and women). That the EEOC did not do so, but rather went to great lengths to specify examples of bona-fide red circling, strongly suggests that there are some transfers for which red circling would not provide an affirmative defense. Or, in other words, the EEOC regulation indicates that the community college's purported policy of never reducing salaries upon transfer would not provide an affirmative defense.

"'Red circling' has yet to be defined in all of its manifestations," <u>Timmer v. Michigan Dep't of Commerce</u>, 104 F.3d 833, 844 (6th Cir. 1997), and "the flexibility of the red circling concept has been preserved in anticipation of the need to reconcile legitimate business necessities with the Act's purpose." <u>Gosa</u>, 780 F.2d at 919. All the same, it is clear to this court, based on

the legislative history, EEOC regulation, and cases that have applied the red-circle principle, that red circling is intended to permit continuing unequal pay only "in extraordinary instances and on and ad hoc basis." Marshall v. J.L. Hudson Co., 1979 WL 1850 (E.D. Mich. 1979) (Pratt, J.) at *8; see also Glenn, 841 F.2d at 1571 ("'factor other than sex' exception applies when the disparity results from ... special exigent circumstances connected with the business") (emphasis added).

Refusing to allow across-the-board red circling furthers the purposes of the Equal Pay Act. See Corning Glass Works, 417 U.S. at 208 ("The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve."). Otherwise, employers could quite easily escape the Act's requirements by simply shuffling employees around. See id. ("To permit the company to escape [its] obligation ... would frustrate, not serve, Congress' ends."). A blanket policy might well immunize

an employer from liability under the Act altogether so long as the employer transferred employees with enough frequency.   This would be very much contrary to the structure of the Equal Pay Act, which imposes a "form of strict liability" on employers for unequal payment of men and women, subject to limited affirmative defenses. Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992).

However, even if an across-the-board salary-maintenance policy could serve as an affirmative defense, in this case WCC has not established that the policy it claims actually exists as a matter of undisputed fact. President Young testified that "it has been the college's policy for everyone that we don't reduce salaries." Young Dep. (Doc. No. 75-2) at 34.   "When they are reassigned or as a result of merger in any way or anyone that is reassigned on a job, we don't--we have never reduced any salaries." Id.  Similarly, Dean Bell stated that, "The College maintained Mr. Glover's salary ...

pursuant to the College's practice not to lower an
employee's pay if he or she is transferred to a position
in a lower classification." Bell Aff. (Doc. No. 70-4) at
52, ¶ 3.

Youngblood has established a genuine dispute of
material fact as to the existence of such a policy.
First, WCC has pointed to no actual written policy to
that effect. See Glenn, 841 F.2d at 1570 n.8
(approvingly noting the district court's conclusion that
"the absence of a writing in the context of other written
policies provides independent support for its finding
that the 'policy' was, in fact, an illegal practice").
Nor has it cited any evidence of previous applications of
the supposed policy. Second, upon discrediting the
community college's account of the reason for Glover's
transfer, a reasonable jury could further infer that the
statements about the supposed policy of not lowering
salaries, unsupported by any documentary evidence, are
likewise not worthy of belief. In other words, were a

jury to discredit the community college's account of Glover's alleged health problems, that itself could serve as circumstantial evidence that the community college's alleged policy was also made up.

Third, Youngblood has offered additional circumstantial evidence indicating that the difference between her salary and Glover's was not due to any across-the-board policy of maintaining salaries upon transfer. WCC twice advertised an open position in the print shop shortly after Youngblood gave notice that she planned to retire. Both announcements provided for the higher E4, 05 salary schedule which Glover received throughout his time in the print shop. Both announcements specified duties that are strikingly similar to those contained in Youngblood's job description. Compare Job Announcements (Doc. Nos. 79-9, 79-10) with Job Description (Doc. No. 80-11). Youngblood argues that these announcements were, in essence, to fill her position. She argues that the college's willingness

to pay a higher salary for the same work that Youngblood had performed, the same higher salary which it had always paid to Glover, offers further support for the notion that the community college paid less to Youngblood than she deserved because of her sex.

WCC argues that Youngblood's job was eliminated upon her retirement and the job announcements were for an entirely new position.  It points out that the 'new' job has one title, "Duplications Technician," while Youngblood had another, "Printing/Duplications Technician."  This point is singularly unpersuasive in light of the fact that Youngblood's own title changed several times over the years and indeed at one point apparently was "Duplications Technician."  See Memorandum (Doc. No. 70-1) at 112; see also Josey Aff. (Doc. No. 70-15) at 2 (emphasizing that "Job duties, rather than job titles, are determinative" for purposes of salary schedule placement).

33

WCC also offers evidence that, notwithstanding what is actually written in the job announcements, the 'new' position is entirely different from Youngblood's. Specifically, it argues that the 'new' job is focused on graphic design and computer skills.  <u>See</u> Bell Aff. (Doc. No. 70-4) at 53-7.  But Youngblood has offered evidence that indicates that that is not so.  Glover testified that Kimberly Johnson, who was hired to fill the 'new' position, currently does the work that Youngblood used to do.  Glover Dep. (Doc. No. 76-3) at 12.  And Johnson herself, when asked to describe her job duties, barely mentioned graphic design.  <u>See</u> Johnson Dep. (Doc. No. 76-4) at 6 (discussing running copy machines, ordering supplies, clearing paper jams, contacting vendors for maintenance and, incidentally, ordering "any kind of software that I need for design work").

Finally, WCC points out that the 'new' job contained a more demanding educational requirement while Youngblood's position required only a high-school

diploma.  But it is undisputed that Youngblood satisfied
the educational requirement for the 'new' position and
she has offered expert testimony that the decision not to
include a similar requirements in her own job description
was "illogical and unjustifiable."   Buford Notes (Doc.
No. 82-12) at 2.  Taking these considerations together,
a jury could discredit the community college's evidence
that the 'new' position is new at all and instead
conclude that the community college simply repackaged
Youngblood's job with a slightly different title and a
higher salary.  And a reasonable jury could certainly
rely on that conclusion as evidence that there is no
college-wide policy of maintaining salaries, but rather
that Youngblood was underpaid based on sex.

The fact that the 'new' job was eventually filled by
Johnson, a woman, would not preclude a jury from reaching
this conclusion.  The question under the Equal Pay Act is
why Glover and Youngblood were paid different amounts,
and specifically whether WCC can show that "sex provided

no basis for the wage differential." Schwartz, 807 F.2d at 907. The evidence about the 'new' job would permit a jury to conclude that the community college was prepared to compensate Youngblood's work at the same E4, 05 salary that Glover received, but chose not to do so. In other words, the evidence relating to the 'new' job tends to establish that Youngblood was paid less than her work merited, while the community college's alleged policy suggests, rather, that Youngblood was paid appropriately but Glover was paid more than his work merited. These are two conflicting explanations for the salary differential, and believing one offers a basis for disbelieving the other. Therefore, although the 'new' job was eventually filled by a woman, the fact that it was advertised at the higher salary schedule offers an additional reason to discredit the community college's claims about the alleged salary-maintenance policy. The court thus finds that the college has failed to establish

36

the existence of its alleged policy as a matter of undisputed fact.

In sum, then, Youngblood has established a prim-facie case of sex discrimination in the form of unequal payment for equal work as between herself and Glover.  WCC has failed to carry its heavy burden to establish, as a matter of law, that it is entitled to the affirmative defense.  As the Eleventh Circuit has observed, "The Equal Pay Act prescribes a form of strict liability:" once the plaintiff has established a prima facie case, "[i]f the defendant fails [to establish the affirmative defense], the plaintiff wins."  <u>Miranda</u>, 975 F.2d at 1533.  Therefore, summary judgment is denied as to this claim.[8]

_____

8. The community college also argues for summary judgment based on the Equal Pay Act's statute of limitations.  <u>See</u> 29 U.S.C. § 255.  The parties agree that, if the Equal Pay Act claim otherwise survives summary judgment and is successful at trial, Youngblood can recover damages for at least some of her past underpayment.  <u>See</u> <u>Ledbetter v. Goodyear Tire & Rubber Co., Inc.</u>, 550 U.S. 618, 640 (2007) (majority opinion) (abrogated by statute on other grounds, PL 111-2, 123 (continued...)

## B.  Title VII

Title VII bars an employer from discriminating against an employee "because of ... race ... [or] sex." 42 U.S.C.2000e-2 (a)(1).  In this case, Youngblood has alleged discrimination, in the form of unequal payment, both because she is black and because she is a woman. Although the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), "is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case," Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011), in this case the parties agree that court should apply it.

---

8. (...continued)
Stat 5); Ledbetter, 550 U.S. at 658 n.8 (Ginsburg, J., dissenting) ("Under the EPA ... a claim charging denial of equal pay accrues anew with each paycheck.") (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 529 (3d ed. 1996)).  Therefore, this argument is about the amount of damages, not whether Youngblood has a claim at all, and will be denied at this time.  The community college can raise this issue at the time of trial.

First, the plaintiff must establish a prima-facie case; this burden is "not onerous."  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). For a claim of pay discrimination, the plaintiff must establish: "(1) she belongs to a [protected group]; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." Cooper v. S. Co., 390 F.3d 695, 735 (11th Cir. 2004), overruled on other grounds as recognized in Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013).

The burden of production then shifts to the employer "to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee." Hall v. Alabama Ass'n of Sch. Boards, 326 F.3d 1157, 1166 (11th Cir. 2003) (incorporating opinion of Thompson, J.). "This may be done by the employer articulating a

39

legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific, and worthy of credence." Id. The burden then shifts back to the plaintiff: "Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies his ultimate burden of demonstrating by a preponderance of the evidence that he has been the victim of unlawful discrimination." Id.

The community college makes two principal arguments for summary judgment on Youngblood's Title VII pay-discrimination claims. First, it argues that Youngblood

failed to identify proper comparators and so failed to establish a prima-facie case.  Second, it argues that it has articulated legitimate reasons for its actions and that Youngblood has not shown those reasons were pretextual.

### a. Prima-Facie Case

The first argument is without merit.  There is significant overlap between a claim under the Equal Pay Act, analyzed above, and a Title VII claim of discrimination in pay.  The Eleventh Circuit has discussed the critical differences in the two claims:

> "The burdens of proof are different under the two laws.  A plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed substantially similar work for less pay.  The burden then falls to the employer to establish one of the four affirmative defenses provided in the statute.  <u>Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs</u>, but a plaintiff has the burden of proving an intent to

> discriminate on the basis of sex (or
> race or national origin)."

Miranda, 975 F.2d at 1526 (emphasis added).[9]  In other words, the standard for appropriate comparators is not more but less stringent when considering a Title VII claim as opposed to an Equal Pay Act claim.  But, as discussed above, Youngblood has already established that Glover is a comparator for Equal Pay Act purposes, and the community college specifically acknowledges as much. See Dft. Reply Br. (Doc. No. 85) at 9 ("There is no dispute that Youngblood and Glover performed the same job duties.").   Under   Miranda,   if   a   comparator   is sufficiently similar under the Equal Pay Act, he is also sufficiently similar under Title VII.  See Mulhall, 19 F.3d at 598 ("Clearly, if plaintiff makes a prima facie

---

9. There is an additional difference, not relevant to this case: under the Equal Pay Act, the plaintiff must show she was employed in the same "establishment" as her comparator, while Title VII does not contain this requirement. Mulhall v. Advance Sec., Inc., 19 F.3d 586, 597 (11th Cir. 1994).

case under the EPA, she simultaneously establishes facts necessary to go forward on a Title VII claim.").

To the extent that WCC argues otherwise, it misreads the caselaw. It cites two unpublished Eleventh Circuit cases for the proposition that, for the purposes of Title VII, "[t]he comparator must be nearly identical to the plaintiff." Drake-Sims v. Burlington Coat Factory Warehouse of Alabama, Inc., 330 F. App'x 795, 803 (11th Cir. 2009) (internal quotation marks omitted, alteration in original); see also Welch v. Mercer Univ., 304 F. App'x 834, 837 (11th Cir. 2008) (same). Both cases rely, in turn, on Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). Wilson involved a claim of discriminatory discipline and noted that, "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Id. For that proposition, it cited Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir.

43

2001), another discipline case, in which the court stated, in relevant part:

> "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed. In order to satisfy the similar offenses prong, the <u>comparator's misconduct must be nearly identical</u> to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

<u>Silvera</u>, 244 F.3d at 1259 (citation and internal quotation marks omitted); <u>see also</u> <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (same).

It is clear, then, that the source of this line of 'identical' language is not a requirement in all Title VII cases that comparators be nearly identical in all regards, but that, in a <u>discipline</u> case, a comparator's <u>misconduct</u> must be nearly identical. See <u>Vega v. Invsco Grp., Ltd.</u>, 432 F. App'x 867, 870 (11th Cir. 2011) ("We have explained that, <u>particularly in cases involving employee discipline or misconduct</u>, the individual that the plaintiff identifies as her comparator must be

44

similarly situated in all relevant respects and that <u>the comparator's misconduct must be nearly identical to the plaintiff</u>.") (emphasis added) (internal quotation marks omitted).

To the extent that <u>Wilson</u> may be read, as WCC reads it, to impose a 'nearly identical' requirement as to all aspects of comparators in all Title VII cases, including pay-discrimination cases, it would directly conflict with the Eleventh Circuit's prior precedent in <u>Miranda</u>.  <u>See Miranda</u>, 975 F.2d at 1526 ("Under the disparate treatment approach of Title VII ... there is a relaxed standard of similarity between male and female-occupied jobs"). <u>Miranda</u> would therefore control under the Eleventh Circuit's prior-precedent rule.  <u>See Burke-Fowler v. Orange Cnty., Fla.</u>, 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006) (applying prior-precedent rule to find that <u>Maniccia</u> controls over later precedent <u>as to discipline claims</u>).

The community college makes no other argument as to the prima-facie case, and the court concludes that Youngblood has established a prima-facie case of pay discrimination based on sex and race.  Therefore, the burden shifts to the community college to raise a genuine issue of fact as to the discrimination.

### b. Non-discriminatory Reason and Pretext

WCC has articulated legitimate, non-discriminatory reasons for paying Youngblood less than it paid Glover: namely, the same practice discussed above of red circling Glover's prior salary because of his alleged health problems and the community college's alleged across-the-board policy of not reducing salaries.  While the court has already concluded that the community college has not established the affirmative defense to the Equal Pay Act based on red circling as a matter of undisputed fact, it has "produc[ed] sufficient evidence to raise a genuine issue of fact as to whether [it] discriminated against

46

[Youngbood]."  Hall, 326 F.3d at 1166.  The community college "has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced."  Id.  Its "burden of production in rebutting the prima facie case is 'exceedingly light.'"  Miranda, 975 F.2d at 1529 (quoting Perryman v. Johnson Products, Inc., 698 F.2d 1138, 1142 (11th Cir. 1983)).  The community college has carried that light burden in this case.

Therefore, the burden shifts back to Youngblood to establish that the proffered explanation is pretextual. This court "must, in view of all the evidence, determine whether [Youngblood] has cast sufficient doubt on [WCC}'s proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [its] proffered 'legitimate reasons were not what actually motivated its conduct.'"  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)).  The court

47

"must evaluate whether [Youngblood] has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [WCC]'s proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538  (internal quotation marks omitted).

The community college argues that Youngblood has simply offered no evidence to support an inference of pretext, but the court disagrees.  As discussed above, Youngblood has cast serious doubt on the health rationale of the transfer: both Youngblood and Glover himself deny that Glover had any health-related problems at his prior position, and neither the contemporaneous memorandum nor any other document cited by the community college contains any indication that the transfer was related to Glover's health.  As discussed above, a reasonable jury could easily conclude, based on this evidence, that the community college and its personnel made up the account

of Glover's health problems after the fact to justify his higher salary.

Similarly, as discussed above, Youngblood has offered sufficient evidence for a jury to conclude that the alleged across-the-board salary-maintenance policy was pretextual as well.  The only evidence that the community college cites to support the notion of a college-wide policy of not lowering salaries comes in the form of testimony from community-college employees, including President Young.  As discussed in more detail above, a jury could discredit the existence of this policy for three reasons.  First, the community college has cited no evidence of any written policy to that effect, nor any evidence of other instances in which prior salaries were maintained pursuant to the policy.  Second, if a jury had already found the community college's account of the reasons for Glover's transfer to have been made up after the fact, that very conclusion would serve as circumstantial evidence to reject the testimony about a

campus-wide policy of maintaining salaries as well.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.") (emphasis added). Third, Youngblood has introduced evidence that the 'new' job advertised upon her retirement was not new at all, but was rather Youngblood's own job but with Glover's higher salary schedule.[10]   This provides further circumstantial evidence to allow a jury to conclude that there was no policy of maintaining salaries and thus that this purported reason for Glover's higher salary was

_____

10. The 'new' job was eventually filled by Johnson, a white woman, and Youngblood pointed to her as an additional comparator for her Title VII claim based on race.  The community college argues that Johnson is not a proper comparator in light of her allegedly different job duties.  The court has not relied on Johnson as a comparator; given that Glover is a clear comparator, the court simply need not reach the question of whether Johnson is also one in order to find a prima-facie case.

pretextual as well.  In other words, based on the total
lack of any corroborating documentation about the
community college's purported reasons for paying him more
than it paid Youngblood, the conflicting evidence about
Glover's health, and evidence tending to show that in
reality Youngblood's job merited the salary paid to
Glover, a reasonable jury could find the community
college's alleged policy did not exist.

The genuine disputes regarding the community
college's proffered explanations, when combined with
Youngblood's prima-facie case, warrant denial of summary
judgment as to the claims.[11]  As the Supreme Court has

---

11. Youngblood also pointed to background evidence to
support her discrimination claims.  She cited this
court's opinions in a previous case regarding race and
sex discrimination in Alabama's postsecondary system.
See Shuford v. Alabama State Bd. of Educ., 846 F. Supp.
1511 (M.D. Ala. 1994) (Thompson, J.); Shuford v. Alabama
State Bd. of Educ., 897 F. Supp. 1535 (M.D. Ala. 1995)
(Thompson, J.).  Youngblood also introduced a memorandum
from the president of the aviation college, where she
first worked, noting that she was one of only three
minorities at the college and that she had apparently
been scheduled for less than full time in order "to limit
her potential for future employment status and for
(continued...)

stated, "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). "Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ..., upon such rejection, [n]o additional proof of discrimination is required...." Id. (emphasis and footnote omitted); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination,

---

11. (...continued)
benefits." Memorandum (Doc. No. 70-1) at 43. The community college objected to this evidence on relevance grounds. The court has not relied on this evidence for the purposes of this opinion and so need not resolve the objection at this time.

and it may be quite persuasive.").  Indeed, the Supreme

Court has been quite clear on this point:

> "In appropriate circumstances, the trier
> of fact can reasonably infer from the
> falsity of the explanation that the
> employer is dissembling to cover up a
> discriminatory purpose.  Such an
> inference is consistent with the general
> principle of evidence law that the
> factfinder is entitled to consider a
> party's dishonesty about a material fact
> as affirmative evidence of guilt.
> Moreover, once the employer's
> justification has been eliminated,
> discrimination may well be the most
> likely alternative explanation,
> especially since the employer is in the
> best position to put forth the actual
> reason for its decision.  <u>Thus, a
> plaintiff's prima facie case, combined
> with sufficient evidence to find that
> the employer's asserted justification is
> false, may permit the trier of fact to
> conclude that the employer unlawfully
> discriminated</u>."

<u>Id</u>. at 147-48 (citations and internal quotation marks

omitted, emphasis added).  In this case, the evidence

allowing a jury to conclude that the community college's

proffered reasons were pretextual, combined with

Youngblood's prima-facie case, is sufficient for the

Title VII claims to reach a jury.  Therefore, summary
judgment will be denied on Youngblood's Title VII
race-and-sex-discrimination claims.[12]


   C. Section 1983 (Equal Protection and § 1981)

   Finally, the court turns to Youngblood's claims that
President Young, in her individual capacity,
discriminated against Youngblood in pay, in violation of
the Equal Protection Clause of the Fourteenth Amendment
and 42 U.S.C. § 1981, as both are enforced through 42
U.S.C. § 1983.  The Equal Protection Clause provides
that, "No state shall make or enforce any law which shall
... deny to any person within its jurisdiction the equal
protection of the laws."  U.S. Const. amend. XIV, § 1.
Section 1981 provides that, "All persons ... shall have
the same right ... to make and enforce contracts ... as

---

   12. For the same reasons stated above, see supra note
8, the community college's motion for summary judgment is
denied to the extent it is based on the Title VII statute
of limitations, 42 U.S.C. § 2000e-5.  See Lilly Ledbetter
Fair Pay Act of 2009, PL 111-2, 123 Stat 5 (abrogating
Ledbetter, 550 U.S. 618).

is enjoyed by white citizens..."  42 U.S.C. § 1981(a).

In the context of an employment-discrimination claim such

as this one, the elements of both the equal-protection

claim and the § 1981 claim are the same as the elements

of a Title VII discrimination claim.  Rice-Lamar v. City

of Ft. Lauderdale, Fla., 232 F.3d 836, 843 n.11 (11th

Cir. 2000).    The  §  1981  claim  alleges  race

discrimination, while the Equal Protection Clause claim

alleges both sex and race discrimination.  Young argues

that she is entitled to both absolute and qualified

immunity.

Young argues first that she is entitled to absolute

sovereign immunity.  The Eleventh Amendment and the

related doctrine of sovereign immunity bar suits against

the State or an arm of the State absent waiver by the

State or valid abrogation by Congress.  Kentucky v.

Graham, 473 U.S. 159, 167 n.14 (1985).  WCC is an arm of

the State.  See LaFleur v. Wallace State Cmty. Coll., 955

F. Supp. 1406, 1422 (M.D. Ala. 1996) (De Ment, J.); State
Bd. of Educ. v. Mullins, 31 So. 3d 91, 96 (Ala. 2009).

Generally, sovereign immunity does not protect state
officials when they are sued in their individual
capacities. Harden v. Adams, 760 F.2d 1158, 1164 (11th
Cir. 1985). "However, 'when a state official is made a
defendant in a suit, whether it is nominally brought
against him in his official or individual capacity, a
court must determine the real, substantial party in
interest.'" Alexander v. Chattahoochee Valley Cmty.
Coll., 325 F. Supp. 2d 1274, 1295 (M.D. Ala. 2004)
(Thompson, J.) (quoting Harbert Intern., Inc. v. James,
157 F.3d 1271, 1277 n.3 (11th Cir. 1998)); see also
Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89,
101 (1984). "'The general rule is that a suit is against
the sovereign if the judgment sought would expend itself
on the public treasury or domain, or interfere with the
public administration, or if the effect of the judgment
would be to restrain the Government from acting, or to

compel it to act.'" <u>Alexander</u>, 325 F. Supp. 2d at 1295 (quoting <u>Harbert</u>, 157 F.3d at 1277 n.3).

Young argues the State is the real, substantial party in interest in this case, noting that she was acting as president of WCC at all relevant times and that Youngblood seeks, among other things, reinstatement of her employment by the community college, or, in other words, by the State. However, the relief Youngblood seeks from Young in her individual capacity is not reinstatement but damages. The Eleventh Amendment does not bar such relief. <u>Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation</u>, 49 F.3d 1490, 1503 (11th Cir. 1995) (Eleventh Amendment did not bar damages against defendants sued in individual capacities in employment discrimination case).[13]

---

13. Young cites this court's decision in <u>Alexander</u> as finding to the contrary, but that case is inapposite. In <u>Alexander</u>, all of the plaintiff's federal-law claims against the individual defendant were resolved on the merits. 325 F.Supp.2d at 1294-5. The court addressed immunity in the context of only the plaintiff's state-law claims, specifically claims that the individual defendant (continued...)

Next, Young invokes qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). In deciding whether an official is entitled to this immunity, courts analyze (1) whether the plaintiff has shown an actual violation of his right and (2), if so, whether the right at issue was clearly

_____

13. (...continued)
"violated state pay laws and regulations and an 'implied contract' by placing Alexander on the wrong pay scale." <u>Id</u>. at 1295-6. In this case, of course, the claims do not sound in contract or in related state regulations. Rather, the claims are that Young discriminated against Youngblood on the basis of race and sex in violation of federal law, which was just the kind of claim permitted in <u>Cross</u>. <u>See</u> <u>Cross</u>, 49 F.3d at 1507 (equal-protection claim based on sexual harassment). Thus, <u>Cross</u> controls, and <u>Alexander</u> is distinguishable.

established at the time it was violated.  Pearson, 555

U.S. at 232.[14]

"Qualified immunity protects government officials, in

their individual capacities, from suit unless the law

preexisting the defendant official's supposedly wrongful

act was already established to such a high degree that

every objectively reasonable official standing in the

defendant's place would be on notice that what the

defendant official was doing would be clearly unlawful

given the circumstances." Pace v. Capobianco, 283 F.3d

1275, 1282 (11th Cir. 2002).  As this court has

explained, the requirement that a right be clearly

established "is fundamentally a question of fair notice:

If the law does not make the officer aware that his

'conduct would be clearly unlawful,' then he is protected

by qualified immunity, Saucier v. Katz, 533 U.S. 194, 202

(2001); however, if the plaintiff can show that 'a

_____

14. Initially, Young must prove that she was acting
within her discretionary authority.  In this case, there
is no dispute that Young was doing so.

59

materially similar case has already been decided' in his favor, then fair notice exists and qualified immunity does not attach. Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)." Schultz v. City of Brundidge, 2012 WL 705358 at *5 (M.D. Ala. 2012) (Thompson, J.); see also Mercado, 407 F.3d at 1159 (discussing ways to demonstrate that right was clearly established).

Here, the equal-protection and § 1981 claims, as they are enforced through § 1983, "effectively merge," Alexander, 325 F. Supp. 2d at 1276 n.1, except that the § 1981 claim applies to only race discrimination and requires a contractual relationship, discussed further below. Otherwise, the elements of both claims are the same in this context as the elements of a Title VII discrimination claim, again with the exception of the contractual requirement of § 1981. Rice-Lamar, 232 F.3d at 843 n.11. Given that the court has already concluded that, with the evidence considered in the light most

favorable to Youngblood, the community college violated her rights under Title VII, it therefore is clear that on the same basis her rights were violated under § 1983. See Hall v. Alabama Ass'n of Sch. Boards, 326 F.3d 1157, 1175 (11th Cir. 2003) (incorporating opinion of Thompson, J.) (applying same analysis for Title VII, § 1981, and Fourteenth Amendment).  The question is whether Young's conduct violated those rights.

The court concludes that, with the evidence considered in the light most favorable to Youngblood, there is sufficient evidence for a jury to find that Young's own conduct did violate Youngblood's rights.  The memorandum first assigning Glover to the print shop with "no salary adjustment" was signed and approved by Young. Memorandum (Doc. No. 78-2) at 36.  Thereafter, she signed both Glover's and Youngblood's employment contracts containing their different salary schedules.  See Contracts (Doc. No 81-8) at 2-14; (Doc. No. 78-2) at 38-39.  If a jury should find that the community college

discriminated against Youngblood in violation of Title VII, then that jury could also conclude that Young herself did so based on her personal involvement and approval of the differential pay. Thus, Youngblood has put forward sufficient evidence to establish, for summary-judgment purposes, that Young violated her equal-protection rights.

Youngblood's § 1981 claim requires an additional step. Young argues that Youngblood cannot recover against her under § 1981 because there was no contract between the two of them; the only relevant contracts were between Youngblood and WCC, although Young signed them on behalf of the community college. Young relies on the Supreme Court's decision in Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006). In that case, the Court found that "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and

enforce.'" Id. at 479-80.[15]   Young argues that Youngblood

has no rights under any contract with Young.

But Domino's Pizza did not require a contract between

the plaintiff and the defendant.   In Domino's Pizza, the

plaintiff, McDonald, alleged that the defendant,

Domino's, breached its contracts with a third party, JWM,

based on racial animus towards McDonald.   Id. at 473.

McDonald was the sole shareholder and president of JWM,

_____

15. The court notes that Domino's Pizza appears to
speak more broadly than is warranted in this regard.   The
opinion states generally that a contractual relationship
is required for all § 1981 claims.   See id. at 476 ("Any
claim brought under § 1981, ... must initially identify
an impaired 'contractual relationship'").   But § 1981
also protects rights that do not directly relate to
contracts: specifically, the rights "to sue, be parties,
give evidence, and to the full and equal benefit of all
laws and proceedings for the security of persons and
property as is enjoyed by white citizens, and [to] be
subject to like punishment, pains, penalties, taxes,
licenses, and exactions of every kind, and to no other."
42 U.S.C. § 1981(a).   Properly read, the Court's ruling
in Domino's Pizza "was limited to the 'make and enforce'
contracts clause of [§] 1981."   Mazloum v. D.C. Metro.
Police Dep't, 522 F. Supp. 2d 24, 38 (D.D.C. 2007)
(Bates, J.).   That is the provision at issue in this
case, so Domino's Pizza does bind this court in resolving
Youngblood's § 1981 claim.

id. at 472, but the Court relied on principles of corporation and agency law to reject the notion that McDonald could therefore step into JWM's shoes for the purposes of his § 1981 claim. Id. at 477. Thus, the Court found, McDonald himself could point to no contract to which he was a party and to no anticipated contract to which he might be a party. The plaintiff therefore had no claim. But the defendant in that case, Domino's, of course was a party to the relevant contract. In this case, Youngblood does point to contracts to which she was a party, namely her employment contracts. Young's argument, that Youngblood must also point to a contract to which the individual defendant was a party, is simply not addressed by Domino's Pizza.

That being the case, Young's argument is foreclosed. Binding precedent in this circuit indicates that a defendant may be liable for interference with a contractual relationship even though the defendant is not herself a party to the contract. Faraca v. Clements, 506

F.2d 956, 959 (5th Cir. 1975) ("a third party's interference with those rights guaranteed under [§] 1981 ... will subject such a person to personal liability"). And, indeed, Domino's Pizza itself approvingly cited a previous case involving defendants similarly situated to Young in which the defendants were not parties to the contracts but rather had allegedly interfered with them. See Burnett v. Grattan, 468 U.S. 42 (1984) (affirming denial of motion to dismiss on statute-of_limitations grounds in suit against president and other officials of college under § 1981).

Thus, this court concludes that Young has read Domino's Pizza too broadly: that case requires that the plaintiff be a party to a contract (or potential party to a potential contract), but applies no similar requirement with regard to the defendant. Because Youngblood was a party to the employment contracts in question, she satisfies Domino's Pizza. And because, otherwise, elements of this claim are the same as the equal-

65

protection claim, the court finds that, with the evidence considered in the light most favorable to Youngblood, there is sufficient evidence for a jury to conclude that Young violated Youngblood's rights under § 1981 as well.

The court therefore turns to the second prong of qualified immunity, whether the rights in question were clearly established. It was, of course, clearly established that Youngblood had a constitutional right to be "free from unlawful ... discrimination ... in public employment." Cross, 49 F.3d at 1507 (citing Davis v. Passman, 442 U.S. 228, 235 (1979)). The same is true of her right to be free from interference with contractual relationships on the basis of her race. See Faraca, 506 F.2d at 959. But whether Young's conduct violated clearly established rights must not be considered "generally and at a very high order of abstraction" but rather "in light of the specific context of the case." Gilmore v. Hodges, 738 F.3d 266, 277-78 (11th Cir. 2013) (internal quotation marks omitted).

In this case, with the evidence considered in the light most favorable to Youngblood, a reasonable jury could conclude that Young intentionally paid Glover more than Youngblood because of Youngblood's race and sex. Young clearly had fair notice that such intentional discrimination in public employment would expose her to liability under the Equal Protection Clause as enforced through § 1983. See, e.g., Nicholson v. Georgia Dep't of Human Res., 918 F.2d 145, 148 (11th Cir. 1990) (no qualified immunity where female employee treated differently solely because of sex); Badia v. City of Miami, 133 F.3d 1443, 1445 (11th Cir. 1998) (no qualified immunity where race and sex discrimination motivated differential treatment of employee); Cross, 49 F.3d at 1503 (denying qualified immunity for § 1983 claim based on supervisor's knowledge of sexual harassment and discrimination). Similarly, it is well established that "[§] 1981 prohibits intentional race discrimination in the making and enforcement of public and private

contracts, including employment contracts." <u>Ferrill v.</u>
<u>Parker Grp., Inc.</u>, 168 F.3d 468, 472 (11th Cir. 1999)
(citing <u>Johnson v. Railway Express Agency</u>, 421 U.S. 454,
459-460 (1975)).[16]   As such, Young is not entitled to
qualified immunity.[17]

---

16.   It could reasonably be argued that, the court
having found that Young is not entitled to qualified
immunity on the § 1983 Equal Protection claim, it is
unnecessary to reach the qualified-immunity issue as to
the §-1981 claim, for the § 1981 claim is effectively
merged into the § 1983 claims <u>Alexander</u>, 325 F. Supp. 2d
at 1277 n. 1, citing <u>Jett v. Dallas Independent School</u>
<u>Dist.</u>, 491 U.S. 701, 735 (1989); <u>Busby v. City of</u>
<u>Orlando</u>, 931 F.2d 764, 771 n. 6 (11th Cir. 1991); <u>Felton</u>
<u>v. Polles</u>, 315 F.3d 470, 482 (5th Cir. 2002).   Indeed,
the § 1981 claim really adds nothing to this litigation.

Moreover, in this case, the court has denied
qualified immunity principally based on "'question[s] of
evidence sufficiency, <u>i.e.</u>, which facts a party may, or
may not, be able to prove at trial.'"   <u>Plumhoff v.</u>
<u>Rickard</u>, 134 S. Ct. 2012, 2019 (2014) (quoting <u>Johnson v.</u>
<u>Jones</u>, 515 U.S. 304, 313 (1995)) (internal quotation
marks omitted).   If all genuine disputes of material fact
are resolved in favor of Youngblood, a reasonable jury
could infer Young intentionally paid Youngblood less
because of race and sex--a violation of clearly
established rights if there ever was one.

17. For the same reasons stated above, <u>see</u> <u>supra</u> note
8, to the extent it is based on the § 1983 statute of
limitations, <u>see</u> <u>McNair v. Allen</u>, 515 F.3d 1168, 1173
(11th Cir. 2008), Young's motion for summary judgment is
denied.   <u>See</u> <u>Groesch v. City of Springfield, Ill.</u>, 635
(continued...)

***

Accordingly, it is ORDERED that the motion for summary judgment (Doc. No. 69) filed by defendants George C. Wallace State Community College and Linda C. Young is denied.

DONE, this the 1st day of July, 2014.

　　　　　　　 /s/ Myron H. Thompson
　　　　　　　UNITED STATES DISTRICT JUDGE

---

17. (...continued)
F.3d 1020, 1028 (7th Cir. 2011).